# Illinois Official Reports

## Appellate Court

---

### *People v. Donlow*, 2020 IL App (4th) 170374

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JORDAN M. DONLOW, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-17-0374 |
| Filed | March 24, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 15-CF-813; the Hon. John M. Madonia, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Benjamin M. Sardinas, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.<br>Presiding Justice Steigmann and Justice Turner concurred in the judgment and opinion. |

**OPINION**

¶ 1        In August 2015, the State charged defendant, Jordan M. Donlow, with one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)), where defendant "knowingly or intentionally and by means of the discharging of a firearm caused an injury to Pierre Hicks, in that said defendant shot Pierre Hicks in the face with a .223 caliber firearm." Following a January 2017 trial, a jury found defendant guilty of aggravated battery with a firearm. In April 2017, the trial court sentenced defendant to a 20-year prison sentence with credit for 603 days served.

¶ 2        Defendant appeals, arguing (1) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), when it failed to ensure a potential juror understood and accepted all four principles enumerated in that rule, (2) the court erred in giving an incomplete jury instruction on prior inconsistent statements, and (3) the court erred when it considered defendant's assertion of innocence as a factor in aggravation at sentencing. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In August 2015, the State charged defendant with one count of aggravated battery with a firearm (720 ILCS 12-3.05(e)(1) (West 2014)), where defendant "knowingly or intentionally and by means of the discharging of a firearm caused an injury to Pierre Hicks, in that said defendant shot Pierre Hicks in the face with a .223 caliber firearm."

¶ 5                              A. Defendant's Jury Trial

¶ 6        In January 2017, the State filed a motion for use immunity under section 106-2.5(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/106-2.5(b) (West 2016)), asking the trial court to compel codefendant, Freddrick Johnson (Fred), to testify as a witness against defendant. Over objection, the court granted the motion. In the motion, the State indicated that if Fred's testimony was inconsistent with his prior statements, the State intended to introduce Fred's videotaped statements as substantive evidence pursuant to section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2016)).

¶ 7        During *voir dire*, the court read the four Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) principles to each juror and asked each juror if they understood and accepted each principle. Specifically, the court asked juror Alfred B., "[Y]ou also understand and accept that the defendant does not have to testify; and if he chooses not to, that fact cannot be held against him in arriving at your verdict?" Juror Alfred B. answered, "I understand." The trial judge asked juror Alfred B. no further questions.

¶ 8        Following *voir dire*, the trial commenced. The parties presented the following evidence.

¶ 9                                    1. Pierre Hicks

¶ 10       Pierre Hicks, the shooting victim, testified that on the afternoon of August 4, 2015, he attended a dice game in the Poplar area of Springfield, Illinois. Hicks rode his bicycle to the dice game with Demarco Johnson (Demarco). Hicks testified to the presence of around four other people at the dice game. Specifically, Hicks testified that Fred arrived at the dice game in a blue vehicle with tinted windows, along with defendant and another man. Only Fred joined the dice game. When asked how he knew Fred, Hicks stated that he knew Fred for several

years and had disagreements with him in the past. Hicks testified he had previously seen defendant before August 4, 2015, but did not know his name. The record shows Fred owned a four-door 2005 Pontiac.

¶ 11 During the dice game, a verbal dispute arose between Fred and Hicks. Fred told Hicks to "stay here, I'll be back" and left with defendant and another man. About 10 minutes later, Fred returned. Upon returning, Fred opened the door to his vehicle, and Hicks testified he saw a long black firearm on Fred's lap. Fred then drove away stating, "[I]t's on, we in war now."

¶ 12 After the interaction with Fred, Hicks and Demarco rode their bicycles toward 24th Street and Cook Street to head home. As they rode through the parking lot of the Walker Funeral Home, Hicks saw Fred in the driver's seat of the same blue vehicle. As Hicks passed the passenger side of the vehicle, the rear-passenger window rolled down, and Hicks saw defendant holding a gun. Hicks then testified that defendant shot at him and struck him in the face.

¶ 13 Hicks testified that after defendant shot him in the face, defendant shot about nine more rounds toward him and Demarco as he ran across Cook Street to a health center. Police officers found Hicks in the health center when they arrived. Due to Hicks's injuries, he communicated with the officers via text message, and when asked who shot him, he wrote "Fred." Hicks claimed he did not write defendant's name because he did not know it. While hospitalized, Hicks viewed two photograph arrays. Hicks identified Fred as the driver of the vehicle and described his role. Hicks identified defendant as the shooter.

¶ 14 After his release from the hospital, Hicks provided a videotaped statement. Subsequently, officers arrested Hicks in March 2016 for possessing half a kilogram of marijuana found in his car. However, the State never charged Hicks with any offense following that arrest.

¶ 15                              2. Demarco Johnson

¶ 16 During Demarco's testimony, Demarco repeatedly stated he did not recall details of the August 4, 2015, shooting. However, when confronted with his statements from an August 6, 2015, interview about the incident with police, he, for the most part, acknowledged making the statements. Demarco testified that on August 4, 2015, he went to a dice game with Hicks. While at the game, a blue Pontiac G6 arrived with two men in it whom Demarco did not know. One of the men had long dreadlocks, and Demarco testified that man and Hicks got into a verbal argument over the dice game. The man with dreadlocks then said, "[B]e here when I get back, I'm going to have something for you." He then drove away but returned soon thereafter and stated, "[T]hat's what we on or that's what I'll do to you?" The man then drove the vehicle away a second time. Demarco did not see a gun.

¶ 17 Demarco and Hicks then rode their bicycles to the parking lot behind the Walker Funeral Home. While in the parking lot, the blue Pontiac approached them. Demarco testified that as the vehicle passed them, he saw a gun pointing out of the rear-passenger window. Demarco then heard nine gunshots and a bullet grazed him. Demarco denied seeing the driver of the vehicle with a gun.

¶ 18 Demarco viewed a photograph array two days after the shooting and identified Fred as the man with dreadlocks. Demarco viewed a second photograph array that included another possible suspect but not defendant. Demarco failed to identify anyone in the photograph array.

### 3. Raymond Bardwell

On August 4, 2015, Raymond Bardwell worked at a nearby business and was on break when the shooting occurred. Bardwell worked about one block east of the Walker Funeral Home with a view of the parking lot behind the funeral home. Bardwell testified that he first saw a blue Pontiac G6 vehicle drive away from him and toward a corner store. About a minute later, the same blue vehicle drove toward him through the funeral home parking lot and pulled alongside two men on bicycles. Bardwell testified that gunfire came from the vehicle before it sped off. Bardwell heard five gunshots total, four in the parking lot and one after the vehicle sped off onto the street. Bardwell then saw the two men on bicycles run toward the funeral home. Bardwell called 911 and spoke with police at the scene.

### 4. Artavyious Williams

Artavyious Williams testified that on August 4, 2015, he attended a dice game where Demarco arrived with a light-skinned black male that Williams did not know. Williams also testified that a man with dreadlocks arrived in a blue vehicle with tinted windows. Williams claimed that Demarco and the man with dreadlocks got into an argument, but the light-skinned male was not involved. After the argument, the man with dreadlocks said that "he was going to be right back" and left. Williams testified that everyone ended up leaving and that he walked toward the corner store at 23rd Street and Cook Street. Williams testified that when he arrived at the corner store, he again saw the blue vehicle and heard several gunshots.

### 5. Leona West

Leona West, Hicks's girlfriend, testified that she received a telephone call on August 4, 2015, about Hicks being shot. West also received a call from Hicks's cellular telephone where a police officer asked if she knew a man named "Fred," and she told him that she knew a Fred Johnson. The officer then stated, "[T]hat's who [Hicks] said shot him or, you know—when he asked what happened, he pointed that name out. That's the name he gave."

On August 10, 2015, Hicks viewed a photograph array with West present and identified Fred. West testified that friends of hers gave her photographs of people who they thought may have taken part in the shooting. West then gave those photographs to the police. One of those photographs showed Fred and defendant together. West testified that she knew defendant as "Jordan" but never met him.

### 6. Springfield Police Officers

Officer Jacob Svoboda testified that on the morning of August 4, 2015, he went to a house in response to a possible domestic incident. When he arrived, he observed defendant helping Fred pack up his belongings, and then the two men left in defendant's vehicle.

Officer Maxwell Paul testified that on August 4, 2015, he responded to a "shots fired" call around 5 p.m. that related to a dice game at 2626 Sherwood Street. When Officer Paul arrived, he observed a single die on the porch of 2626 Sherwood Street. While he was investigating, Officer Paul heard a radio report about someone in a blue Pontiac G6 in the 2300 block of East Cook Street shooting at two black males on bicycles. Officer Christopher Steffen arrived as backup for Officer Paul and testified to the same events.

¶ 29 After receiving the radio dispatch, the officers drove to the location of the shooting in the Walker Funeral Home parking lot. There, Officer Steffen observed two bicycles, several shell casings, a white shirt with blood on it, and three bullet holes on the south side of the funeral home. Officer Steffen talked to Bardwell at the scene.

¶ 30 Officer Paul observed Hicks with a jaw injury at the health center across the street from the funeral home. Officer Paul witnessed Hicks communicating via his cellular telephone with Sergeant Brian Graves regarding who "shot him." Sergeant Graves testified that he asked Hicks who shot him and that Hicks showed him the name "Fred" on his phone. Officer Paul and Sergeant Graves later talked to West. West told Sergeant Graves that Fred's last name was Johnson and that he lived by her and Hicks.

¶ 31 In the funeral home parking lot, Detective Don Bivens recovered eight casings, several human teeth, a white shirt with blood on it, and two bicycles. Detective Bivens noted the casings were most likely from a .223-caliber gun.

¶ 32 Detective Timothy Zajicek conducted the photograph arrays with Demarco on August 6, 2015, and with Hicks on August 10, 2015. Detective Ryan Irwin created each array. Due to Hicks's difficulty speaking, Detective Zajicek provided Hicks with lined paper to describe what each person did during the shooting. Hicks identified defendant in one array and wrote that he was the shooter. Hicks identified Fred in another array and wrote under Fred's photograph, "I want to kill that b***." Hicks described Fred's involvement, stating

"[H]e went and got a gun because a petty argument and came back with it, he was driving with it in his lap telling me he in war. We was on Sherwood, off Evergreen. I was on a bike. I made [it] almost [to] Cook, and he handed the gun in the backseat. The first shot hit me in my face. Then I took off, I believe it says running. They shot about eight more shots."

¶ 33 Detective Charles Redpath arrested defendant at his home around August 10, 2015. Defendant attempted to flee when officers arrived. Once detained, defendant asked Detective Redpath to get his telephone from inside the house. While fetching defendant's telephone, Detective Redpath saw a large target sheet that looked like it had been fired upon. Detective Redpath recovered the sheet.

¶ 34                                    7. Fred

¶ 35 Fred initially asserted his fifth amendment right against self-incrimination on the stand. After being informed by the trial court, it would hold him in criminal contempt should he refuse to testify because of a motion for use immunity, Fred testified. While Fred admitted making statements to police on August 14, 2015, regarding the details of the events on August 4, 2015, he testified he could not recall exactly what he said.

¶ 36 After Fred's testimony, the court held a sidebar to determine whether the State could substantively admit the video of Fred's custodial statements. The court found that Fred's testimony, claiming not to remember the substance of his prior statements, allowed the State to substantively admit prior recordings of his statements to police. However, the court instructed the jury to disregard any statements on the video not attributable to or adopted by Fred.

## 8. Fred's Custodial Statements

Detective Irwin testified that he investigated the case to determine whether Fred acted alone. Detective Irwin initially believed that Jamarius Waters had been with Fred during the shooting because a police report written prior to the shooting stated that police found Fred and Waters in a vehicle where Waters possessed a firearm. Detective Irwin included Waters's photograph in the array Demarco viewed, but Demarco failed to identify Waters as being involved in the shooting.

Detective Irwin later learned of a police report detailing the domestic incident involving Fred on the morning of August 4, 2015, where defendant was present and left with Fred. Detective Irwin received information from West about defendant's potential involvement in the shooting. Detective Irwin created a photograph array with defendant's photograph, and Hicks identified defendant as the shooter.

On August 14, 2015, Detective Irwin interviewed Fred, with his attorney present. The State introduced into evidence the entirety of that taped statement. In the statement, Fred implicated defendant in the shooting. On April 12, 2016, Detective Irwin again interviewed Fred with his attorney present. The State also introduced this tape into evidence. In the second interview, Fred further implicated defendant. In each statement, Fred told police that someone called defendant and stated that, as Fred and defendant drove away from the dice game, someone shot at them. Detective Irwin testified that police made no arrests based upon such a shooting and that nothing showed such a shooting occurred.

## 9. Jury Instructions

During the jury instruction conference, defense counsel objected to the jury receiving Illinois Pattern Jury Instructions, Criminal, No. 3.11 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.11) on "Prior Inconsistent Statements." Specifically, defense counsel objected to the instruction "giving validity to the admission by the State of two other statements by the codefendant in this case." The trial court overruled the objection, stating,

> "I understand. This Court has already pronounced and ruled on that issue. And having made its ruling, it is absolutely imperative that this jury be instructed on how to handle such evidence, so this will be given over the Defendant's objection.

> I believe it is properly—do you have any objection at all, counsel, to the wording? I understand you don't want it given and you'd prefer that evidence not come in at this trial, but that's different than objecting to the wording of the instruction. I have reviewed it, I believe it is properly worded in accordance with the evidence and the IPI criminal [No.] 3.11."

The court asked counsel if he had any "further objection as to the substance of the instruction." Counsel did not.

The instruction given to the jury omitted [2] of IPI Criminal No. 3.11, which includes the language, "the statement narrates, describes, or explains an event or condition the witness had personal knowledge of." According to the directions for IPI Criminal No. 3.11, when an earlier inconsistent statement is offered for impeachment purposes, and another earlier inconsistent statement is offered as substantive evidence, the instruction should have been given as follows:

> "The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case.

Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of;

and

the statement was accurately recorded by a tape recorder, videotape recording, or a similar electronic means of sound recording.

It is for you to determine what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made." IPI Criminal No. 3.11.

¶ 44 However, the instruction given read as follows:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when *** the statement was accurately recorded by a tape recorder, videotape recording, or a similar electronic means of sound recording.

It is for you to determine what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made." IPI Criminal No. 3.11.

¶ 45                                         10. Verdict

¶ 46 Following deliberations, the jury found defendant guilty of aggravated battery with a firearm.

¶ 47                    B. Defendant's Posttrial Motions and Sentencing Hearing

¶ 48 On February 24, 2017, defendant filed a motion for a new trial alleging, *inter alia*, that the trial court erred in giving IPI Criminal No. 3.11 over objection. On April 4, 2017, the trial court denied defendant's motion for a new trial and held a sentencing hearing. At the hearing, defendant addressed the court, stating:

"I would just like to say to the courtroom that this whole case does not revolve around me. As in testimony Pierre Hicks said I was not involved in the dice game or the argument, so why would I be involved in the shooting that had nothing to do with me? This case is brought upon Freddrick Johnson being the victim, I mean not the victim, but a part of this whole problem between Pierre and Johnson that has nothing to do with me. And as Demarco Johnson said in the video, the shooter had on a ninja mask, which means that it concealed his identity. So, therefore, how does all this come upon me of being the shooter? Therefore, that's all I have to say, Your Honor."

¶ 49 After defendant addressed the court and asserted his innocence, the trial court stated that it considered the presentence investigation report, evidence and argument in aggravation and

mitigation, the statutory factors, and defendant's assertion of innocence in determining defendant's sentence. Specifically, the court stated:

"Whether your criminal conduct is the result of something likely to reoccur or whether your character and attitude as the defendant indicate you're unlikely to commit another crime, while this Court is [in] no position to punish you for exercising your right to a trial and continuing to proclaim innocence, a jury heard this evidence, heard the testimony, weighed it all and essentially considered you to be an enforcer for one [Fred]. And in refusing to accept any responsibility, this Court has to question whether or not the sooner you're released the sooner you will be going back to this particular life of crime. It's hard to argue that the circumstances will not reoccur or that you have the character and attitude of someone who is unlikely to commit another crime when faced with the evidence, the jury verdict and now an opportunity, there's simply no acceptance of any responsibility. That position doesn't allow the Court to factor in mitigation to the degree that your attorney is looking for when requesting a sentence at the low end of the sentencing range."

The court then addressed the State's factors in aggravation, stating that a different analysis was required. Ultimately, the court sentenced defendant to a 20-year prison sentence with credit for 603 days served followed by a 3-year period of mandatory supervised release.

¶ 50 In May 2017, defendant filed a motion to reconsider his sentence and a motion to reconsider the denial of his motion for new trial. In the motion to reconsider the denial of the motion for new trial, defendant argued that in giving IPI Criminal No. 3.11, the court misstated the law when it omitted the portion of the instruction that stated, "the statement narrates, describes, or explains an event or condition the witness had personal knowledge of." The State conceded the error but maintained the error was inadvertent, defense counsel failed to object to the wording of the instruction at trial, and that no issue arose at trial related to Fred's personal knowledge of the events relayed in the taped statements. The court agreed with the State that at trial defense counsel failed to make an objection about the wording of the instruction. Defense counsel counterargued that the omitted language related to important evidence that the State was trying to get in and that counsel only discovered the error in modifying the instruction since the last hearing.

¶ 51 The trial court denied the motion, stating

"that the second part of the analysis other than it was inadvertent and specific language not caught or objected to at the time, specifically that language by the Defendant, it also goes to a fact that is uncontroverted in all of the evidence that what the videotape evidence that was played was describing was obviously something that the witness had personal knowledge of. So, the error, as inadvertent as it was, not captured by counsel during the, or the Court for that matter, during the jury instruction conference, in looking at it, the type of language that was neglected to be included in light of the evidence, the error that was inadvertent at the time this Court does not find justification to un-do an otherwise valid jury verdict."

¶ 52 The trial court next addressed defendant's motion to reconsider his sentence. Defense counsel argued that the court used defendant's statement in allocution as a factor in aggravation. The State and court acknowledged that defendant made a statement in allocution. The court stated that defendant's assertion of innocence "went to rehabilitative efforts that he would have while in custody when the whole crux of your position is that you've been

- 8 -

wrongfully treated during the process and you've even been potentially wrongfully convicted." The court denied defendant's motion to reconsider his sentence. Subsequently, defendant filed a notice of appeal.

¶ 53    On September 26, 2017, defendant filed a motion for leave to file a late notice of appeal. On September 28, 2017, this court granted defendant's motion for leave to file a late notice of appeal.

¶ 54    This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56    On appeal, defendant argues that (1) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), when it failed to ensure a potential juror understood and accepted all four principles enumerated in that rule, (2) the court erred in giving an incomplete jury instruction on prior inconsistent statements, and (3) the court erred when it considered defendant's assertion of innocence as a factor in aggravation at sentencing. We review each issue in turn.

¶ 57    To preserve an error for consideration on appeal, a defendant must object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Failure to do so constitutes forfeiture. *Id.* However, we may consider a forfeited claim where the defendant demonstrates a plain error occurred. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To prevail under the plain error doctrine, a defendant must first demonstrate a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). If an error occurred, we will only reverse where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.*

¶ 58    Defendant failed to raise issues one and three before the trial court, rendering the issues forfeited. *Sebby*, 2017 IL 119445, ¶ 48. Therefore, we review those claims for plain error. Whether plain error occurred is a question of law we review *de novo*. *People v. Jones*, 2016 IL 119391, ¶ 10, 67 N.E.3d 256.

¶ 59    In contrast, both the State and the trial court addressed, on the merits, defendant's contention that the trial court erred in giving an incomplete jury instruction on prior inconsistent statements. Thus, we decline to find defendant forfeited this issue. Usually, jury instructions are reviewed for an abuse of discretion. However, as we explain later, where we must determine whether the instruction given correctly explained the law, our review is *de novo*. *People v. Anderson*, 2012 Il App (1st) 103288, ¶ 34, 977 N.E.2d 222.

¶ 60                                   A. Rule 431(b)

¶ 61    Defendant first argues that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), when it failed to ensure that a potential juror understood and accepted all four principles enumerated in that rule. The State argues defendant failed to show that the court's compliance constituted a clear and obvious error under Rule 431(b). We agree with the State.

¶ 62    The Illinois Supreme Court adopted Rule 431(b) to ensure compliance with the requirements of *People v. Zehr*, 103 Ill. 2d 472, 476, 469 N.E.2d 1062, 1063-64 (1984). Rule 431(b) requires a trial court to ask potential jurors whether they both "understand[ ]" and "accept[ ]" that (1) the defendant is presumed innocent, (2) the State bears the burden of proving the defendant guilty beyond a reasonable doubt, (3) the defendant has no obligation to present evidence, and (4) the defendant's choice to not testify cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Rule 431(b) "mandates a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010).

¶ 63    The trial court engaged in a specific question and response process as required by Rule 431(b) when it inquired into juror Alfred B.'s understanding and acceptance of the *Zehr* principles. As it relates to one of the principles, Juror Alfred B. responded, "I understand." Defendant argues that a clear and obvious error occurred where juror Alfred B. responded "I understand" to one of the principles and the court failed to clarify if he also accepted the principle.

¶ 64    Defendant relies on *People v. Brown*, 2017 IL App (1st) 142197, 82 N.E.3d 148, in support of his argument. In *Brown*, the trial court failed to follow up on a juror's understanding of one of the *Zehr* principles when the juror answered "I don't understand' " to one of the court's Rule 431(b) questions. *Id.* ¶¶ 34-35. On appeal, the reviewing court found that an error occurred because the trial court failed to comply with Rule 431(b). *Id.* ¶ 39. We find *Brown* distinguishable.

¶ 65    Rule 431(b) simply "mandates a specific question and response process." *Thompson*, 238 Ill. 2d at 607. The trial court asked juror Alfred B. whether he understood and accepted the four principles. Thus, we find that the trial court complied with Rule 431(b). See *People v. Willhite*, 399 Ill. App. 3d 1191, 1197, 927 N.E.2d 1265, 1270 (2010) (concluding the trial court complied with Rule 431(b) when it asked jurors if they understood and would follow the four principles). The juror in *Brown* stated she did *not* understand, which is the opposite of juror Alfred B.'s response. In situations such as this, and in *Brown*, the trial court must use its discretion and engage in follow-up questioning as necessary. While juror Alfred B. failed to also say "I accept," we do not find that equivalent to saying, "I don't understand." A juror who indicates a lack of understanding is unable to properly apply the principle. Thus, such a response requires further inquiry to ensure that the juror is fit to serve. Here, we see no need for follow-up questioning. Absent is any evidence in the record suggesting that juror Alfred B. failed to accept the principle. Thus, we find no clear or obvious error occurred. As the error was not clear or obvious, defendant's claim fails. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 66                                B. IPI Criminal No. 3.11

¶ 67    In this case, the trial court admitted evidence of prior inconsistent statements made by Fred as substantive evidence. Defendant argues that, as to Fred's prior inconsistent statements, the trial court erred in giving an incomplete IPI Criminal No. 3.11 prior inconsistent statements instruction. Defendant argues the error is reversible under the first prong of the plain error doctrine. In response, the State concedes it was error to omit a section of the jury instruction but maintains defendant is unable to prevail under the first prong of plain error where the evidence was not closely balanced.

¶ 68    Given our prior determination that forfeiture is inapplicable on this issue, we decline to undertake plain error analysis. Instead, as explained below, we find IPI Criminal No. 3.11 to

be an incorrect statement of the law and reject its use in the manner suggested by defendant or at all in this case. Thus, we affirm the trial court's judgment.

¶ 69 Here, defendant complains that the instruction was inaccurate because it omitted [2] of IPI Criminal No. 3.11, which states, "the statement narrates, describes, or explains an event or condition the witness had personal knowledge of." The introductory paragraph of which [2] is a part reads as follows: "However, you [meaning the jury] may consider a witness's earlier inconsistent statement as evidence without this limitation [which is discussed in the instruction's previous opening paragraph] when ___." IPI Criminal No. 3.11. Thus, the instruction tells the jury it may consider the witness's earlier inconsistent statement only if the jury is first able to conclude, under [2], that "the statement narrates, describes, or explains an event or condition the witness had personal knowledge of." The State concedes that the instruction at issue was deficient but argues that defendant suffered no prejudice under the particular circumstances of this case. However, we decline to accept the State's concession because IPI Criminal No. 3.11 is not a correct statement of the law and not properly given in this case.

¶ 70 The fundamental problem with IPI Criminal No. 3.11 is that it mistakenly equates the criteria for the admissibility of substantive evidence of a prior inconsistent statement under section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2016)) with a factual question for the jury to resolve. Specifically, the bracketed material under IPI Criminal No. 3.11, including [2], which is at issue in this case, describes criteria the *trial court* must apply to determine whether the prior inconsistent statement at issue is substantively admissible.

¶ 71 In this instance, the trial court needed to determine whether Fred's statement "narrates, describes, or explains an event or condition the witness had personal knowledge of." In the event the court determines Fred lacked personal knowledge of the event or condition in question, the statement would not be admissible. Conversely, if the court determines that Fred did have personal knowledge of the event or condition in question and also finds that the other statutory criteria are met, the court should admit the statement, and the statutory criteria are no longer at issue.

¶ 72 Once the trial court determined Fred's statement was admissible, the only question for the jury was what weight to give the statement. Whether the prior inconsistent statement that the trial court deemed admissible "narrates, describes, or explains an event or condition the witness had personal knowledge of" is *never* an issue for the jury to resolve. Thus, we reject defendant's claim that the jury needed to determine that the statement "narrates, describes, or explains an event or condition the witness had personal knowledge of."

¶ 73 Moreover, in circumstances like this case, where no statement was admitted for the limited purpose of attacking believability, IPI Criminal No. 3.11 should not have been given at all. All evidence admitted is admitted substantively, and the jury may consider all evidence before it in reaching its verdict *unless* the trial court informs the jury that some particular kind of evidence has been received for a limited purpose. Accordingly, when a prior inconsistent statement has been admitted substantively, juries need not and should not be instructed regarding such statement any more than they need to be instructed about any other evidence the trial court has admitted. Our position is supported by paragraphs 5 and 6 of the committee note to IPI Criminal No. 3.11.

¶ 74 Paragraph 6 of the committee note reads as follows:

"There is no need to use this instruction when the earlier inconsistent statement is being offered as substantive evidence under Section 115-10.1 and no earlier inconsistent statement is being offered for use only for the purpose of impeachment." IPI Criminal No. 3.11, Committee Note.

¶ 75 Additionally, paragraph 5 of the committee note correctly points out that all evidence is substantive unless limited to a nonsubstantive purpose.

¶ 76 Considering the above analysis, we find the trial court did not err when it neglected to include language from IPI Criminal No. 3.11, stating that "the statement narrates, describes, or explains an event or condition the witness had personal knowledge of." However, the court did err in giving the instruction at all where the only inconsistent statements admitted came in as substantive evidence. Even so, the use of the instruction afforded defendant an advantage by requiring the jury to make certain findings properly left to the trial court. Given the impropriety of the use of IPI Criminal No. 3.11 at all, let alone in the manner suggested by defendant, defendant's claim fails.

¶ 77                    C. Ineffective Assistance of Trial Counsel

¶ 78 In the alternative, defendant argues his trial counsel was ineffective for failing to object during trial to the inaccurate wording of the jury instruction. The State argues that while the court provided a deficient instruction, defendant suffered no prejudice as a result of the missing language because it is indisputable that Fred's statement narrated, described, and explained the events based on his personal knowledge.

¶ 79 We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, the defendant must show defense counsel's performance was deficient and prejudice resulted from counsel's deficient performance. *People v. Houston*, 226 Ill. 2d 135, 143, 874 N.E.2d 23, 29 (2007). Specifically, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767 (quoting *Strickland*, 466 U.S. at 694).

¶ 80 Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38, 743 N.E.2d 521, 540 (2000).

¶ 81 In light of our resolution of defendant's IPI Criminal No. 3.11 instruction claim, counsel cannot be considered ineffective for failing to advocate using IPI Criminal No. 3.11 as suggested by defendant. Had counsel done so, his position would have been contrary to the law and an improper use of IPI Criminal No. 3.11. Thus, defendant's ineffective assistance of counsel claim is without merit.

¶ 82                              D. Defendant's Assertion of Innocence at Sentencing

¶ 83        Lastly, defendant argues that the trial court erred when it considered defendant's assertion of innocence as a factor in aggravation at sentencing. While defendant admits he failed to preserve this issue for appeal, he argues that this court may review the issue under either prong of the plain error doctrine. See *Piatkowski*, 225 Ill. 2d at 565. The State argues that no clear or obvious error occurred where the totality of the trial court's statements regarding defendant's failure to accept responsibility disprove defendant's claim. We agree with the State.

¶ 84        A trial court cannot impose a more severe sentence simply "because a defendant refuses to abandon his claim of innocence." *People v. Byrd*, 139 Ill. App. 3d 859, 866, 487 N.E.2d 1275, 1280 (1986). However, trial courts may consider a defendant's lack of remorse or lack of veracity in imposing a sentence, since those are factors which may have "a bearing on the defendant's potential for rehabilitation." *People v. Speed*, 129 Ill. App. 3d 348, 349, 472 N.E.2d 572, 573 (1984). In determining whether the trial court took defendant's failure to admit his guilt following conviction into account in its decision, reviewing courts have focused upon whether the trial court expressly indicated or implied that defendant would have received better treatment on sentencing if he had abandoned his claim of innocence. *People v. Costello*, 95 Ill. App. 3d 680, 688, 420 N.E.2d 592, 597-98 (1981). If the court does so indicate, then the sentence likely was improperly influenced by the defendant's persistence in his innocence. *People v. Sherman*, 52 Ill. App. 3d 857, 859, 368 N.E.2d 205, 207 (1977). However, if "the record shows that the court did no more than address the factor of remorsefulness as it bore upon defendant's rehabilitation," then the court's reference to a defendant's claim of innocence will not amount to reversible error. (Internal quotation marks omitted.) *Costello*, 95 Ill. App. 3d at 688. A trial court's statements during sentencing are not read in isolation from one another but rather in light of the entire record on appeal. *People v. Ward*, 113 Ill. 2d 516, 527-28, 499 N.E.2d 422, 426 (1986).

¶ 85        During sentencing, defense counsel argued for a lower sentencing range based on defendant's lack of a criminal record to rebut the State's request for a 28-year sentence. After defendant addressed the trial court and asserted his innocence, the court stated that, in determining defendant's sentence, it took into consideration the presentence investigation report, evidence, and argument in aggravation and mitigation, the statutory factors, and defendant's assertion of innocence. Specifically, the court stated,

> "Whether your criminal conduct is the result of something likely to reoccur or whether your character and attitude as the defendant indicate you're unlikely to commit another crime, while this Court is [in] no position to punish you for exercising your right to a trial and continuing to proclaim innocence, a jury heard this evidence, heard the testimony, weighed it all and essentially considered you to be an enforcer for one [Fred]. And in refusing to accept any responsibility, this Court has to question whether or not the sooner you're released the sooner you will be going back to this particular life of crime. It's hard to argue that the circumstances will not reoccur or that you have the character and attitude of someone who is unlikely to commit another crime when faced with the evidence, the jury verdict and now an opportunity, there's simply no acceptance of any responsibility. That position doesn't allow the Court to factor in mitigation to the degree that your attorney is looking for when requesting a sentence at the low end of the sentencing range."

The court then addressed the State's factors in aggravation, stating that a different analysis was required.

¶ 86 Based on the trial court's statements at sentencing, defendant argues that the court used his assertion of innocence as a factor in aggravation, resulting in him receiving a greater sentence. Specifically, defendant alleges that a clear and obvious error occurred where the court told defendant it was not giving him a lower sentence—as requested by trial counsel—because "there's simply no acceptance of any responsibility." Defendant relies on *Byrd*, 139 Ill. App. 3d 859, and *Speed*, 129 Ill. App. 3d 348, in support of his argument.

¶ 87 In *Byrd*, the trial court at sentencing compared the two defendants of the crimes, stating that one defendant admitted his guilt and then concluding that the other defendant, who did not admit his guilt, deserved a harsher sentence. 139 Ill. App. 3d at 866 ("Mr. Moore at least had the benefit of admitting his involvement, admitting his crime, the first step to redemption, perhaps. We have a continual denial here by Mr. Byrd of any involvement." (Internal quotation marks omitted.)). On appeal, the reviewing court vacated and remanded for a new sentencing hearing without consideration of the defendant's continuing denial of guilt. *Id.*

¶ 88 In *Speed*, the trial court stated that it changed the defendant's sentence because of his protestation of innocence at the hearing and did not address the defendant's likelihood of rehabilitation. 129 Ill. App. 3d at 350-51 ("After a portion of the testimony I thought perhaps a ten[-]year sentence might be appropriate. When Mr. Speed said he didn't commit the crime [for] which he stands charged and convicted [that] tilted the scale the other way." (Internal quotation marks omitted.)). The appellate court found that the trial court improperly increased defendant's term of imprisonment based solely on his refusal to admit guilt. *Id.* at 351. We find *Byrd* and *Speed* distinguishable.

¶ 89 Here, the trial court expressly stated to defendant that "this Court [is] in no position to punish you for exercising your right to a trial and continuing to proclaim innocence." Furthermore, the court stated that the State's factors in aggravation required a different analysis. Rather, the court addressed defendant's assertion of innocence regarding his rehabilitative potential and noted that his failure to accept responsibility failed to justify mitigation. Just because the court declined to consider defendant's assertion of innocence in mitigation does not mean the court considered it in aggravation. Considering the record, we reject defendant's claim that the court used defendant's assertion of innocence as a factor in aggravation. When read in its totality, the court's statements clearly rebut defendant's interpretation of the sentencing hearing. As no clear or obvious error occurred, defendant's claim failed to rise to the level of plain error, and we need not address defendant's claim of ineffective assistance of counsel for failing to preserve this issue in the motion to reconsider sentence. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 90                                          III. CONCLUSION

¶ 91 For the reasons stated, we affirm the trial court's judgment in this case.

¶ 92 Affirmed.