2023 IL App (2d) 210469-U
No. 2-21-0469
Order filed January 3, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19 CF 2173 |
| JUAN MORENO-JIMENEZ, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in admitting as excited utterances two out-of-court statements made by the sexual-assault victim at the hospital, and defendant's sentence of 11 years' imprisonment for criminal sexual assault was not excessive.

¶ 2    Defendant, Juan Moreno-Jimenez, was convicted after a jury trial of criminal sexual assault and sentenced to 11 years in prison. On appeal, he contends that the trial court (1) abused its discretion in admitting as excited utterances two out-of-court statements made by the victim and (2) imposing an excessive sentence by failing to consider defendant's rehabilitation as an objective of his sentence, improperly considering a factor inherent in the offense, and punishing defendant

for maintaining his innocence. The State argues that the trial court did not abuse its discretion regarding the evidentiary rulings. Alternatively, the State contends that any errors were harmless. The State also maintains that defendant's mid-range sentence of 11 years was not an abuse of discretion. For the reasons that follow, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4      Defendant was charged with one count of criminal sexual assault, which alleged that on or about August 4, 2019, he committed an act of sexual penetration against H.L. and knew that H.L. was unable to understand the nature of the act or was unable to give knowing consent. 720 ILCS 5/11-1.20(a)(2) (West 2018). The alleged incident occurred during the early morning hours of August 4, 2019. Defendant stopped by the residence of Kevin McCormick, H.L.'s boyfriend, and joined a gathering of friends around a backyard firepit. H.L. had previously left the backyard and gone into her boyfriend's basement bedroom to sleep. At some point, defendant entered the house and went to the basement bedroom. H.L. woke up when she was aware that someone was on her back penetrating her vagina with his penis. She initially thought it was her boyfriend, but she immediately panicked upon realizing that it was defendant who was a stranger to her. The police were called, and defendant was arrested.

¶ 5      Before trial, the State filed a motion *in limine* seeking the admission of several out-of-court statements made by H.L. pursuant to the excited utterance exception to the hearsay rule. The State proffered that Madison Farley would testify that she observed H.L. run upstairs from the basement bedroom, hyperventilating and yelling that someone had had sex with her while she was sleeping. The State proffered that John Crawford, McCormick, and Steven Reilley would testify that they were present right after the incident occurred and observed H.L. screaming, crying, and making statements that there was a man in her bed who had sex with her while she was sleeping. The State

proffered that Officer Kurt Swanson, who responded to the scene, observed H.L. getting into an ambulance, drove the short distance to meet H.L. at the hospital, and spoke with her about the incident. Officer Swanson observed that H.L. was still upset, angry, and emotional and made statements about being assaulted by a man in her bed while sleeping. A recording of the 911 call H.L. made before the police arrived was played to show her emotional state at the time.

¶ 6    Defense counsel objected to the admission of all of these statements, particularly the statements of McCormick, Reilly, and Officer Swanson. Defense counsel argued H.L. had the opportunity for reflection and even learned defendant's name when she previously stated she did not know her attacker. With regard to Officer Swanson's statements, defendant argued that the 911 call, which H.L. made before Officer Swanson had the opportunity to speak with her, demonstrates that she had time to reflect; therefore, her statements to him cannot be considered spontaneous.[1]

¶ 7    The trial court granted the State's motion *in limine* regarding Farley's statements. With regard to all of the other statements, the court also granted the motion subject to the court receiving additional information by way of witness testimony and subject to cross-examination and specific objections made by defendant. The case proceeded to a jury trial.

---

[1]The trial judge listened to H.L.'s 911 call, however, it was not admitted into evidence and is not included in the record on appeal. Appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and any doubts which may arise from the incompleteness of the record will be resolved against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 8        The State called Officer Swanson of the Rockford Police Department as its first witness. He testified that he was dispatched to McCormick's residence at around 5:45 a.m. for a reported sexual assault. When he arrived, he observed seven to eight people, including some police officers, standing in the street. When he approached the group, he observed a Hispanic male who was completely naked and lying on the curb. He observed H.L. crying while standing near an ambulance with another female. At the direction of his supervisor, Officer Swanson followed the ambulance transporting H.L. to the hospital. Officer Swanson spoke to H.L. in a room in the emergency department. Her friend, Farley, was present as were some medical staff. He stated that this occurred approximately 10 minutes after leaving the scene. He observed that H.L. was "visibly upset, crying, [and] seemed frustrated and angry at the same time." Over the objection of defense counsel, Officer Swanson testified as to what H.L. said to him. She told him she woke up to a stranger having sex with her in her boyfriend's bedroom. She did not know the assailant's name, but described him as "that fat-nosed, fat-faced Mexican." She said he was the person lying in the street naked at the scene.

¶ 9        On cross-examination, Officer Swanson said he observed Farley get into the ambulance with H.L. to go to the hospital. He stated that while he spoke to H.L. at the hospital, he advised her to submit to a rape-kit examination. Officer Swanson left the room to speak to a nurse. When he returned, she and Farley had left the hospital. On redirect, Officer Swanson testified that H.L. was still upset at the hospital and described that "she would go from crying while answering my questions to being angry while answering my questions and all around seemed very frustrated." He stated that H.L. told him that she did not know defendant before the incident.

¶ 10       Timothy Charlton, a patrol officer with the Rockford Police Department, testified next. He was also dispatched to McCormick's residence on the morning of the incident. When he arrived

at the scene, he observed a naked man lying on the side of the street. He described the suspect as a middle-aged Hispanic man. Officer Charlton identified defendant in court as the suspect. Defendant was being detained by other officers, and there were five or six people standing nearby. He stated that his duties were to photograph the suspect and the residence. Numerous photos of the residence were admitted into evidence, including a photo of a firepit with empty beer cans and burned wood located at the back of the residence. Officer Charlton also described taking photos inside the residence. He stated that the backdoor of the residence led directly to a stairway leading to the basement and at the bottom of the stairs there was a laundry area leading into a partially finished bedroom. There was a pair of men's boxer shorts at the bottom of the stairs. In the bedroom area, there was a bed with the sheets and mattress cover disturbed, a dresser, a nightstand, and clothing on the floor. The clothing on the floor included a bra, a dress, and women's underwear.

¶ 11 On cross-examination, Officer Charlton testified that defendant was mumbling and appeared to be intoxicated while lying on the curb. Defendant was naked except for one shoe and something around his neck. There was another shoe and a pair of boxer shorts on the ground nearby which were collected as evidence. Officer Charlton stated that they did not find any khaki shorts at the scene. He also collected a pair of blue boxer shorts from the bottom of the basement stairs in McCormick's house because McCormick indicated that they were not his.

¶ 12 H.L. was then called to testify. She testified that she is 23 years old and has lived in the Rockford area her entire life. In August 2019, she was in a relationship with McCormick. On August 3, 2019, she attended a corn boil with her mother. Later, she went to Rocky's Bar and Grill (Rocky's) in Loves Park for drinks with her father and McCormick. They were introduced to and also had drinks with Farley and Crawford. She stated that she, McCormick, Farley, and

Crawford drove to McCormick's house to continue socializing around his firepit. They were joined at one point by the next-door neighbor, Larry Sims, and his girlfriend. H.L. testified that at around 2 a.m., she decided to go inside to sleep. She entered the residence alone through the back door and went downstairs to McCormick's bedroom in the basement. There was no one else in the house. She said she removed her dress and bra, placed them on the floor, and went to bed as she normally does, wearing only her underwear. She fell asleep. H.L. testified that she woke up to the pressure of someone on her back. She thought it was McCormick, and she said his name and asked him to get off her. She pushed her body upwards, the person fell to her side, and she realized it was not McCormick. It was someone she had never seen before. The man was just smiling at her and not speaking. She described the man as a "Mexican" with a "really round face." She made an in-court identification of defendant as the man who assaulted her that morning. Before she pushed him off, the man was moving and penetrating her vagina with his penis. She said she thought it was her boyfriend at first which is why she said his name and asked him to stop. When she saw it was a stranger, she said she was in a "panic" and kept asking who he was. He started talking but she did not understand what he was saying, because of his accent, because he possibly was not speaking coherently, and because she was upset and confused after just waking up in that way. She stood up and realized she was completely naked, so she grabbed a blanket from the bed, wrapped it around herself, and ran upstairs.

¶ 13    H.L. testified that she saw Farley and Crawford sleeping on the couch and said: "there is a Mexican guy in the basement that just raped me but can someone please go downstairs and get him." H.L. stated that Crawford went downstairs, and Farley stopped in the hallway and told H.L. to stay upstairs. H.L. saw defendant walk up from the basement wearing nothing but shorts. When defendant left the house, she went back downstairs to get some clothes. She then went outside and

observed defendant walking into the neighbor's house. She testified that she was feeling vulnerable, "Like a child that had just gotten everything ripped away." She felt sick, disgusted, and "really nasty, like my body just felt gross."

¶ 14 H.L. was alone when she walked outside at first because the others were focused on defendant. McCormick came over to her, pointed to defendant, and asked her if he was the person who assaulted her. She replied yes. McCormick went over to defendant and started a physical altercation with him. McCormick and Crawford dragged defendant from the back of Sims's house to the curb in front of his house. At this time, H.L. went into McCormick's house and called 911 to report that she had been raped and that the assailant was laying in the street. She walked out of McCormick's house while still on the phone with 911 and saw numerous police officers and an ambulance outside.

¶ 15 H.L. testified that she went to the hospital by ambulance. She did not remember very clearly if Farley was in the ambulance with her, but Farley was with her in the emergency room. When asked if she spoke to Officer Swanson in the emergency room, she replied "I really don't remember much. I know there were a few officers that were in the room, but I— the whole thing is kind of a haze." H.L. testified that multiple nurses asked her many questions, including whether she would submit to a rape-kit examination, if she wanted to take tests for sexually transmitted diseases, and if she wanted to take a plan B. She testified that during all of this, a "Mexican male nurse" walked into her room which made her "snap." She stated that she "freaked out" and ran out of the hospital. She stated she was wearing McCormick's son's basketball shorts and a t-shirt and had no shoes or socks. Prior to leaving, the staff told her that her examination would take approximately three hours. She left and did not complete the rape-kit examination. A few days later, H.L. spoke to a detective and viewed a photographic line-up to identify the suspect. She

identified the person in photograph No. 6 as her assailant. At the time, she stated that she was 90% sure because the man in photograph No. 4 looked very similar in her opinion.

¶ 16 On cross-examination, H.L. stated that she arrived at Rocky's around 6 or 7 p.m. She explained that she was introduced to Farley, who is the daughter of one of her father's closest friends. She said they left to go to McCormick's house around 11 p.m. or midnight where they continued to drink around the firepit. She recalled Sims and his girlfriend coming over briefly. She never saw defendant before the incident. H.L. stated that McCormick and Crawford dragged defendant to the street by his shorts and defendant's short were pulled off in the process. She testified that Crawford and McCormick continued to punch defendant while on the curb. She acknowledged that she called 911 because she was concerned that they were going to kill defendant and she "didn't want them to risk going to prison over somebody that raped me." When asked about the photographic line-up, H.L. stated that she may have told the police she was 70% sure photograph No. 6 was the assailant.

¶ 17 On redirect, H.L. acknowledged that she had several drinks that evening, but it did not affect her memory of everything that happened. She stated any problems remembering things are due to the fact that the incident occurred almost two years prior to trial. She said she did not recall how her underwear ended up on the floor. She explained that she believed photograph No. 6 was "almost positively" her assailant, but she qualified her identification because she did not want to wrongly identify someone. She explained that the men in photograph Nos. 4 and 6 had many similar facial features.

¶ 18 The State next called Officer Rebecca Anderson, a detective with the special-crimes unit of the Rockford Police Department. She has special training to investigate sexual crimes and child abuse. She testified regarding the procedures followed to conduct a photographic line-up. Officer

Anderson testified that she presented the photographic line-up to H.L. She stated that H.L. was not certain, but she was 70% sure that photograph No. 6 was of her assailant. On cross-examination, Officer Anderson stated that she did not recall H.L. making a specific reference to photograph No. 4.

¶ 19    The State called Farley as its next witness. She testified that on August 3, 2019, she went to Rocky's with her boyfriend, Crawford. They initially were at Rocky's to help her father who works in the kitchen. Later, they were hanging out and she met H.L. and McCormick. After having drinks and playing pool, McCormick invited them back to his residence where they sat around a firepit in the backyard and had more drinks. Farley testified that a while later Sims came over from next door and defendant arrived sometime after that with his dog. Farley stated that she had not previously met any of these people. Farley played with defendant's dog while McCormick, Crawford, Sims, and defendant continued to talk and drink around the firepit. McCormick invited Farley and Crawford to stay on his couch rather than arrange for a ride home given the time. After a while, she and Crawford went into the house to sleep on the couch. Sims, McCormick, and defendant remained outside. Farley stated that H.L. had gone to bed long before defendant arrived and had been downstairs in bed for a few hours before she and Crawford went inside. She testified that everything was quiet for a while when they were on the couch until they were surprised by H.L. running up the stairs and screaming. Farley stated that H.L. was screaming that someone was in her bed. Farley and Crawford went downstairs, and she saw defendant on the bed. She observed that defendant was on his side and "just smiling" as if nothing was wrong. Farley stated that she went upstairs to be with H.L. They looked for a phone to call 911. Once upstairs, she heard a lot of commotion, and defendant ended up outside with Crawford and McCormick who had been at Sims's house. Crawford and McCormick dragged defendant to the street. Farley stated that

defendant was "beat up" in front of McCormick's house. She testified that defendant was not wearing any clothing at the time. Farley explained that during this time she stayed near H.L. who was crying and was "frantic and terrified and confused." Farley explained that everything happened very quickly, and H.L. was screaming on the phone to the police, telling them to hurry up. The ambulance and police arrived very quickly, and defendant was arrested. Farley stated that she rode in the ambulance with H.L. She described H.L.'s demeanor as scared and said, "I could see it in her eyes that she didn't want anybody to touch her." They were alone in the back of the ambulance because H.L. did not want the EMTs around her. She only wanted Farley, a female, to be with her. The ride to the hospital took just a few minutes. While in the emergency room, H.L. was still scared and "confused still because she didn't understand why that was even happening to her."

¶ 20    At this point, the State's attorney asked Farley if H.L. made any statements about what had happened at this point. Farley said yes and was asked to explain. Defense counsel objected, arguing that the timing was not established for any spontaneous declaration and the testimony was beyond the scope of the motion *in limine*. The State acknowledged that Farley testified differently than he expected, but that she should be allowed to testify as to H.L.'s statements because it was a short ride to the hospital, and H.L. was still under the same stress of the event. The court sustained the objection subject to further foundation. The following colloquy took place:

> "[ASSISTANT STATE'S ATTORNEY]: Q:  Ms. Farley, is it fair to say that you were alongside of [H.L.] from the time that you woke up to the time you were at the hospital room with her?
>
> A:  Yes.

Q: Now, could you estimate how much time had passed from when you woke up to being in the hospital?

A: I would say it would have taken possibly 40 to 45 minutes because it was not very bright outside but when we got to the hospital it was pretty bright and this was in the middle of summer.

Q: So based on the amount of light outside?

A: Yes. It was at least 45 to – it could – like 45 to an hour.

Q: Okay. And that entire time that you were with [H.L.], did she ever seem to calm down or change her demeanor?

A: No.

Q: Now, when [*sic*] you originally said when you woke up she was screaming and yelling; is that correct?

A: Right.

Q: And was she still worked up about that in the hospital?

A: Yes.

Q: And how long did you say it took to get from the house to the hospital?

A: A few minutes. It was a short ride.

Q: Now, when you were in the hospital room, you were there from the beginning when she got brought into the room?

A: Yes.

Q: And when she was in the hospital room, was she making statements about what had happened?

A: Yes.

Q: What did she say?

[DEFENSE ATTORNEY]: Objection, Your Honor. Again, foundation.

THE COURT: As to the foundation only at this point, sustained.

BY [ASSISTANT STATE'S ATTORNEY]:

Q: Was there anyone else in the room with you?

A: No.

Q: Well, to clarify, when she was talking about what had happened, was there anybody else in the room with you?

A: No.

Q: And had there been other people in and out of the room before and after that?

A: Yes.

Q: And who were those people?

A: I remember a police officer and I remember at least one hospital employee, a nurse or CNA or whoever she was.

Q: And so this was about 45 minutes after you had woken up; is that correct?

A: Yes.

Q: And that's when [H.L.] started telling you about what had happened?

A: Yes.

Q: What did she say about what had happened?

[DEFENSE ATTORNEY]: Same objections, Your Honor.

THE COURT: At this point overruled subject to cross."

¶ 21 Farley then testified that H.L. told her that she woke up because someone had "penetrated" her. H.L. told her that she looked at him and saw it was not McCormick, it was defendant, and he

was just smiling at her. Farley testified that H.L. did not give any further description of the person who assaulted her because she "did not have to." Farley explained that she knew who it was because she had seen him in the basement immediately afterwards. She testified that she left the hospital with H.L. because H.L. wanted to go home. A few days later she was interviewed by a detective and was shown a photographic line-up. She identified defendant as photograph No. 4 (which was the same as photograph No. 6 in H.L.'s line-up). She stated that she recognized him because she had seen him at the house and then again in the bed in the basement bedroom.

¶ 22    On cross-examination, Farley stated that McCormick drove her, Crawford, and H.L. to his house around midnight and they stayed outside around the firepit until about 4 a.m. She testified that H.L. went inside to go to bed around 1:30 a.m. and she and Crawford went inside around 4:30 a.m. Farley testified that after the incident she was in the basement for two minutes, which was long enough to "see and recognize who was there." She stated that Crawford dragged defendant, who was naked, upstairs and out of the house. Farley explained that because she was focused on protecting H.L., she did not see exactly how Crawford held defendant as he brought him upstairs and out of the house. She stated that she did not see McCormick punch defendant. She also did not see defendant coming out of Sims's house next door. Farley stated that defendant seemed unconscious when he was laying on the ground and Crawford and McCormick were hitting him. Farley stated that she was embracing H.L. and H.L. did not want to look. Farley stated that they found Crawford's phone and H.L. called 911. She did not see how defendant got to the curb where he was when the police arrived.

¶ 23    The State called John Crawford to testify. He testified that he was at Rocky's on the evening of August 3, 2019, with his girlfriend, Farley, and her father. There they were introduced to McCormick and H.L. The two couples drank and played pool until they decided to go to

McCormick's home where they sat around the firepit, had a few drinks, and talked. Crawford testified that Sims briefly came over from next door then returned home. Defendant showed up on a bicycle later and was introduced as a "friend from the neighborhood." Crawford stated that he did not know any of these people before that evening. McCormick invited Crawford and Farley to sleep on his couch, so they would not have to arrange for a ride home given the time. He stated that H.L. had gone to bed much earlier. He and Farley slept on the couch in McCormick's living room until they were awakened by H.L. frantically coming upstairs. She was yelling that there was someone in her bed and it was not McCormick. Crawford explained that he was "hazy" from just waking up. Crawford described H.L.'s tone of voice as frantic and said she was "freaking out." He stated that she "implied that there was a sexual assault." Crawford stated that McCormick was not there, so he went downstairs to figure out what was going on. In the basement, he saw defendant lying on the bed naked with a bicycle headlamp around his neck.

¶ 24    Crawford stated that he yelled at defendant asking what he was doing and indicating that he needed to get out of there. Defendant was coherent and asked Crawford "would you like to join" and Crawford became furious. Crawford stated that defendant then "kind of pretended to be like out of it, asleep, but obviously he was not." Crawford testified that he "helped [defendant] out of the place" by dragging him up the stairs by the headlamp around his neck. By the time they were outside on the driveway, McCormick had returned from the neighbor's house and was very upset. Crawford explained that defendant was pretending to be unconscious, but he was not, and at one point he was resisting, so there was a "little altercation but not much." Crawford stated they took defendant to the curb because they were just trying to get him away from the house. Crawford testified that he thought the police arrived within 20 minutes, but he was not present when they arrived. He explained that he was on probation and did not want to have any police contact, so he

left to allow the others to handle the matter. After being arrested for a probation violation a few days later, Crawford decided to talk to the police about the incident.

¶ 25    On cross-examination, Crawford stated when defendant arrived on his bike, he was wearing khaki shorts and a shirt and had his dog with him. Crawford did not remember telling the police that when he first saw defendant in the basement bedroom, defendant had his khaki shorts around his ankles and that he helped him pull them up. He did not recall telling the police that defendant had basically walked up the stairs on his own. He also did not recall stating that he had taken defendant into Sims's house. He did recall McCormick punching defendant. Crawford stated that he did not remember how many times he had hit defendant.

¶ 26    The State next called Kevin McCormick to testify. He testified that he lives in Rockford and Sims is his next-door neighbor. On August 3, 2019, H.L. was his girlfriend. They spent the evening at Rocky's with her father and some new friends, Crawford and Farley. The two couples went back to his house later that evening where they were hanging out around his firepit. He testified that defendant was his friend and he had known him for four or five years. Defendant stopped by that evening and joined the group around the firepit. McCormick testified that Crawford and Farley went into his home to sleep on his couch. H.L. had already gone inside to sleep in his bed. After a while, he went next door to Sims's house along with defendant where they continued to hang out. At some point, defendant left. McCormick stated that he did not know where defendant went, but he assumed, because of the time, that defendant had gone home. About five minutes later, defendant returned to Sims's house along with Crawford. McCormick stated that after speaking with Crawford, he left to go check on H.L. He saw her outside of his home and she was "upset and crying and hyperventilating." McCormick testified that H.L. said to him "Some Mexican just fucked me while I was sleeping." He went back to Sims's house to confront

defendant. Defendant did not respond and appeared very drunk. McCormick stated that he and Crawford dragged defendant out of Sims's house. McCormick left defendant lying on the ground "sleeping," at the bottom of the stairs outside of Sims's house and returned to check on H.L. who was standing outside "noticeably upset." He stated that she was repeating the same thing he told her previously over and over, and "she was crying, and barely could talk, barely could breath[e]." She had the comforter from his bed wrapped around her and was otherwise naked. McCormick returned to where defendant was lying on the ground. Sims indicated that he did not want defendant on his property, so Crawford and Sims carried defendant to the curb. Defendant's shorts were around his ankles, and he had a headlamp around his neck. McCormick stated that he tried to talk to defendant and ask him what he had done, but defendant did not answer. McCormick stated that by this time someone had called the police. The police arrived very quickly. A few days after the incident, McCormick viewed a photographic line-up and identified the defendant as the person in photograph No. 6 (which was the same photo identified by Farley and H.L.).

¶ 27    On cross-examination, McCormick stated that he and H.L. went to Rocky's for dinner and arrived around 6 p.m. They left Rocky's around 8:30 or 9 p.m. He indicated that Sims came over for a short time around 9 or 9:30 p.m. and defendant arrived shortly after that. He stated that they were all sitting near the firepit. He stated that H.L. was no longer drinking because she did not feel well so she went to bed around 11:30 p.m. He explained that Crawford and Farley did not have a vehicle and planned to take an Uber home, but he offered that they could sleep on his couch. Farley went inside to sleep soon after H.L., and Crawford joined her a short while later. McCormick testified that he owns a construction company and defendant had worked for him on occasion as a general laborer.

¶ 28    McCormick stated that at around 1 a.m., he went to check on those inside. He went to his bedroom and observed H.L. sleeping under the covers. H.L. was completely naked. He stated that he laid on the bed with her for a couple of minutes, gave her a hug, and kissed her goodnight. McCormick went back outside. Because it was getting chilly, the group remaining around the firepit decided to go inside Sims's house to continue socializing. This included McCormick, Sims, and defendant. Sims's girlfriend was also in his house. He observed that defendant was very intoxicated. Defendant was wearing khaki shorts and no shirt when he left Sims's house, and he was dressed the same when he returned. McCormick denied punching defendant in the face but indicated that he did push him toward the back door in Sims's house. Crawford pulled defendant by the headlamp around his neck out the door and down the stairs outside of Sims's house. McCormick did not see anyone strike or kick defendant while he was lying at the bottom of the stairs. McCormick denied kicking or punching defendant while defendant was lying on the curb.

¶ 29    The State called Steven Reilly to testify. He testified that he lives next door to Sims and McCormick's house is on the other side of Sims's. On August 4, 2019, he woke up between 4 and 4:30 a.m., took a shower, and walked outside to his back porch to let his dog out at around 4:45 a.m. He observed that his neighbors were having a "get-together, and it's common that they do that." He testified that he was familiar with defendant, as defendant had worked for McCormick off and on and had been over at McCormick's quite often. Reilly testified that on the morning in question, while he was on his back porch drinking coffee and smoking, he observed a group of people going into Sims's house. At this time, he also observed defendant sitting in a chair in the backyard. Defendant appeared to be sleeping or passed out. A few minutes later, he observed defendant walk into McCormick's house and go downstairs. He knew defendant went downstairs because his house has the same layout as McCormick's. Reilly testified that he went inside for

two or three minutes to feed his dog and refill his coffee. He returned to his porch. He testified that two or three minutes after that, he saw H.L. running out of McCormick's house and yelling "that damn Mexican raped me." Reilly thought H.L. was wearing "sweats, maybe something like that, and a shirt, but shortly after one of the women that was in the house brought her a blanket." He observed that she was "shaking" and "in tears." Reilly testified that he went into his house to get his phone and called 911.

¶ 30  Reilly testified that he observed Crawford coming across the backyard with defendant and they both entered Sims's house. Reilly stated that he saw them take defendant out of the house and McCormick was yelling at him and asking him what he had done. He observed Crawford grab defendant around his neck and "basically threw him down the stairs." He then saw McCormick and Crawford "physically beat [defendant] out into the street." Reilly testified that he thought it was "getting way, way out of hand," so he went to tell them to stop and to let them know that the police were on their way. Reilly stated that he got in front of Crawford and Sims got in front of McCormick to stop them from kicking defendant. Reilly stated that the police arrived within minutes. He testified that when defendant was taken out of Sims's house, he was wearing "a pair of pants that weren't buckled and by the time he hit the bottom of the stairs they were pretty much off–were off of him." A couple days later, Reilly met with a detective and viewed a photographic line-up, and identified defendant from the same photo as H.L., Farley, and McCormick.

¶ 31  On cross-examination, Reilly described his neighbors as "partiers" that "last longer than most," so they often stay outside until early morning. He testified that he observed Crawford, McCormick, Sims, Sims's girlfriend, and defendant outside when he got up and went out on his back patio. H.L. and Farley were not there. He walked outside and said "hey, guys, it's morning just in case you don't know." They laughed and everyone went inside except defendant who

remained in the chair sleeping or passed out. When he saw defendant go into McCormick's house, he assumed defendant went downstairs based on his familiarity with the configuration of the house. He stated that when H.L. ran outside a few minutes later screaming, she may have been wearing shorts and not sweatpants. After that, defendant, who was walking on his own but being led by Crawford, exited McCormick's house and went to Sims's house. They were at Sims's house just long enough for McCormick to yell repeatedly at defendant "what did you do," and then defendant was pushed out of Sims's house. Defendant's khaki shorts fell down around his ankles while he was being pushed down the stairs. Reilly stated that McCormick and Crawford were punching him as they moved down the driveway toward the street. By the time defendant was at the curb, his shorts had fallen off.

¶ 32    The State rested. Defendant moved for a directed verdict which was denied. Defendant did not testify or present any other evidence. The jury found defendant guilty of criminal sexual assault. Defendant filed a motion for judgment notwithstanding the verdict or a new trial which was denied.

¶ 33    In his posttrial motion, defendant renewed his objection to the admission of H.L.'s out-of-court statements as excited utterances. Specifically, defendant argued that the court erred in allowing repeated statements made by H.L. beyond statements she made when she first ran up the stairs. He argued that the statements were no longer spontaneous when she made them outside on the street and again 45 minutes later at the hospital. He argued further that the repetition was unduly prejudicial. The court denied the motion, finding that all of statements H.L. made to other witnesses were made in "fairly direct sequence" from the time of the criminal sexual assault through her transport to the hospital. The court found sufficient foundation to permit the witnesses

to testify. The court explained that "it made its best judgment in exercising its discretion on that issue and is standing by that judgment."

¶ 34    The sentencing hearing was held on July 16, 2021. The State submitted that the sentencing range for the class 1 felony of criminal sexual assault was 4 to 15 years in the Department of Corrections, that truth in sentencing applies at 85%, that there is a period of mandatory supervised release of 3 years to natural life, and that this is a non-probationable offense. The State argued for a "lengthy sentence including the maximum allowed." Defendant argued for the minimum 4-year sentence.

¶ 35    The court noted that it had considered all of the relevant evidence and each of the statutory factors in aggravation and mitigation. The court noted that defendant was 51 years old at the time of sentencing. The court did not give much weight to defendant's criminal history which included three prior convictions for driving under the influence, one in 1994 and two in 2000, and his most recent conviction of a traffic charge in 2003. Further, the court noted that the victim impact statements made by H.L. and her mother referred to the harm caused to H.L. which is inherent in the offense and already accounted for in the sentencing range and by the fact that the sentence must be served at 85%. The court did not find any statutory mitigating factors to be applicable. The court noted that defendant's prior alcohol-related offenses and the evidence that he was "borderline blackout drunk" on the evening of the incident suggest substance abuse may have been a contributing factor. The court noted that intoxication is not a defense at all and may even aggravate in some ways. The court acknowledged the State's argument that a significant sentence was necessary to deter others from committing sexual assault, noting particularly that H.L. was in her boyfriend's home where she had every expectation that she would be safe. However, the court

stated that the importance of a severe sentence for deterrence is reflected in the applicable sentencing range for the offense.

¶ 36    Defendant made a statement in allocution where he professed his innocence and suggested that he was the victim in this case.  He stated that he believed that the three men attacked him and robbed him of $170, and that H.L. and the witnesses made up the story about the sexual assault to cover up their unprovoked attack on him.  The court noted that defendant's statement in allocution "makes almost no sense whatsoever" and was "implausible" and tended to indicate that he was minimizing and "making up a fantasy story as to what happened or what probably happened that evening in order to justify the conduct that he is now convicted of before this Court."

¶ 37    After considering all of the evidence and statutory factors, the court determined that an appropriate sentence to deter others from committing the same conduct and to ensure that defendant could not engage in that conduct for a substantial period of time was 11 years in prison.

¶ 38    Defendant filed a motion to reconsider sentence.  He argued that his lack of significant criminal background warranted a lesser sentence.  Referring to this case as a "garden variety case, as opposed to something with particular aspects of it that make it more harmful than another," defendant should have been sentenced to the minimum. He argued that a four-year sentence was an appropriate sentence for a deterrent effect in this case.  The motion was denied, and this appeal followed.

¶ 39                                II. ANALYSIS

¶ 40    Defendant raises two issues in this appeal.  First, he challenges the admission of two out-of-court statements made by the victim as excited utterances.  Second, he argues that the trial court imposed an excessive sentence by failing to consider his rehabilitation as an objective of the sentence, erroneously considering a factor inherent in the offense, and punishing him for

maintaining his innocence. The State argues that the trial court did not abuse its discretion regarding the evidentiary rulings, and alternatively, any errors that may have occurred were harmless. Regarding defendant's 11-year sentence, the State asserts that it did not constitute an abuse of discretion.

¶ 41                    A. Admission of H.L.'s Statements at the Hospital as Excited Utterances

¶ 42    Defendant challenges the admission as excited utterances statements H.L. made to two witnesses after she was transported to the hospital. Officer Swanson was permitted to testify that during his interview at the hospital, H.L. stated that she woke up to a stranger having sex with her in her boyfriend's bedroom. She said she did not know the assailant's name, but described him as "that fat-nosed, fat-faced Mexican." She told the officer her assailant was the person lying in the street at the scene. Similarly, Farley, who rode in the ambulance with H.L., was permitted to testify that while they were in the hospital emergency room, H.L. told her that she woke up because someone had "penetrated" her. H.L. told her that she looked at him and saw that it was not McCormick, it was defendant, and he was just smiling at her.

¶ 43    Defendant argues that H.L. had time for reflection between the alleged attack and her arrival at the hospital where she made the statements to Officer Swanson and Farley. He argues further that H.L. had the opportunity and "motive" to fabricate the statements made at that time. He contends that immediately after the incident, H.L. stated that there was someone in her bed and it was not until later that she specified that the person was having sex with her; he contends that this elaboration was a way "to protect her boyfriend [McCormick] and explain why he had severely beaten [defendant]." Further, defendant contends that the testimony was "needlessly cumulative" of similar statements made to McCormick, Reilly, and Farley which were admitted into evidence without objection, thus, the testimony was unduly prejudicial.

¶ 44    Decisions regarding the admissibility of evidence rest within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *People v. Brand*, 2021 IL 125945, ¶ 36.   A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the trial court's position.  *People v. Becker,* 239 Ill. 2d 215, 234 (2010).

¶ 45    A statement that would otherwise be inadmissible hearsay may be admitted as substantive evidence under the excited-utterance exception to the hearsay rule if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Ill. R. Evid. 803(2) (eff. March 24, 2022).  For a statement to be admitted as an excited utterance, the proponent must show an occurrence "sufficiently startling to produce a spontaneous and unreflecting" statement, the absence of time for the declarant to fabricate, and that the statement relates to the circumstances of the occurrence.  *People v. DeSomer*, 2013 IL App (2d) 110663, ¶ 12.  "Such statements have enhanced reliability because when people are under physical or mental shock, the stress of the situation typically causes them to express their genuine beliefs as to facts they have just observed."  *People v. Mayberry*, 2020 IL App (1st) 181806, ¶ 27.  Courts analyze the totality of the circumstances to determine if the excited-utterance exception applies. *People v. Sutton,* 233 Ill. 2d 89, 107 (2009).  "The totality of the circumstances analysis involves consideration of several factors, including time, the mental and physical condition of the declarant, the nature of the event, and the presence or absence of self-interest."  *Sutton*, 233 Ill. 2d at 107. Regarding the time factor, the declarant's statements need not be contemporaneous to the occurrence of the startling event.  *People v. Dominquez*, 382 Ill. App. 3d 757, 768 (2008) (citing *People v. Smith,* 152 Ill. 2d 229, 259-60 (1992)).  "The period of time that may pass without affecting the admissibility of a statement varies greatly."  *Sutton*, 233 Ill. 2d at 107.  Further, the

time factor is not viewed in isolation but must be viewed in the context of the event. *People v. Connolly*, 406 Ill. App 3d 1022, 1025 (2011). The critical inquiry is "whether the statement was made while the excitement of the event predominated." *Smith*, 152 Ill. 2d at 260 (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 803.3 (5th ed. 1990)).

¶ 46    In this case, H.L. waking up to the realization that a stranger was sexually assaulting her and the ensuing altercation she witnessed as her friends subdued her attacker who remained on the scene was a sufficiently startling occurrence, and the statements she made in the hospital were undeniably related to circumstances of this occurrence. The question is whether H.L. had the time to reflect or fabricate the statements made to Farley and Officer Swanson while she was in the emergency room. Considering the totality of the circumstances, we cannot conclude that the trial court abused its discretion in allowing H.L.'s statements into evidence as excited utterances.

¶ 47    Farley testified that she believed the time between H.L. running up the stairs after the assault and H.L. making the statements in the emergency room was approximately 45 minutes. By all accounts the scene remained chaotic that entire time. The record reveals that the moment H.L. woke up realizing that a stranger was having sex with her, she was upset, angry, and scared and she remained in that mental state throughout the resulting ordeal where her friends subdued her assailant and during the short ride in the ambulance to hospital.

¶ 48    H.L. testified that she was screaming and sobbing as she ran upstairs to seek assistance after the incident, finding Farley and Crawford in the living room. Farley testified that H.L. was screaming that someone was in her bed. Crawford testified that H.L.'s tone of voice was frantic, she was "freaking out", and she "implied that there was a sexual assault." H.L.'s assailant remained in the house until Crawford physically removed him from the premises. Realizing she was naked, H.L. donned clothing that was not even hers, went outside and instinctively hid

underneath McCormick's lifted truck out of fear. H.L. witnessed the ensuing physical altercation between defendant, McCormick, and Crawford, which Reilly described as "getting way, way out of hand" to the point where he and Sims decided to intervene. H.L. went inside McCormick's house to find a phone and called 911. Although the recording of the 911 call was not admitted into evidence, H.L. testified that she repeatedly said "there is this guy that just raped me", "I need you guys to come get him", and "he's laying [*sic*] in the middle of the street, come pick him up." She also expressed fear that McCormick and Crawford were going to kill defendant. She explained that she "didn't want them to risk going to prison over somebody that raped [her]." H.L. testified that she was still on the phone with the 911 operator when she stepped back outside and saw numerous police cars and the ambulance on the scene. The police had already been dispatched as a result of the first 911 call made by Reilly.

¶ 49    H.L. stated that the police officers told her she needed to go to the hospital, and she stated that "everything was so hectic I just wanted to be removed from the situation I was in so I got [in] an ambulance." Farley testified that the ride to the hospital took just a few minutes and she was alone with H.L. in the back of the ambulance. She testified that H.L. was scared and did not want anyone else, including the EMTs, around her. Farley stated that they did not talk in the ambulance. In describing H.L.'s demeanor in the emergency room, Farley stated that it was the same as when she first encountered her running up the basement stairs. H.L. remained scared and confused and agitated. Farley testified that she did not say anything to her until they were alone in the emergency room. Officer Swanson testified that H.L. was "visibly upset, crying seemed frustrated and angry at the same time." Further, H.L. left the hospital without completing the rape-kit examination after becoming further upset when a Hispanic male nurse walked into her room. She explained "it just made me snap. I just couldn't – I couldn't stay there."

¶ 50    The record reveals that H.L. remained under the stress of the occurrence when she spoke to Farley and Officer Swanson in the emergency room. A reasonable person could conclude that there was not time for reflection or fabrication by H.L. during the chaos that ensued immediately following the incident. The fact that the statement made to Officer Swanson was in response to an inquiry does not destroy its spontaneity. See *People v. Connolly*, 406 Ill. App. 3d 1022, 1025-226 (2011). Furthermore, the fact that H.L. had spoken with someone else prior to making the statements in the hospital does not render the exception inapplicable under the facts in this case. See *People v. House*, 141 Ill. 2d 323, 386 (1990) (finding there is no *per se* rule that a declarant cannot make an excited utterance to one person after having previously spoken to another). As previously stated, the critical inquiry is whether the statement was made while the excitement of the event predominated. The statements H.L. made in the emergency room reflect the shock and outrage she experienced that morning when she awoke to a stranger having sex with her which continued through the chaos as her friends subdued her attacker, who remained on the premises. We conclude that the excitement of the occurrence of the morning of August 4, 2019, predominated while H.L. was in the emergency room and made the statements to Officer Swanson and Farley.

¶ 51    We reject defendant's contention that H.L. did not say she had been penetrated by defendant at the first opportunity as an indication that her statements in the hospital were not spontaneous. The record belies this argument. Officer Swanson testified that he was dispatched to McCormick's home due to a 911 call regarding a sexual assault. Reilly was the person who called 911. He did so and reported a sexual assault after he saw H.L. running out of McCormick's house yelling "that damn Mexican raped me." H.L. testified that she told Crawford and Farley "there is a Mexican guy in the basement that just raped me." Her testimony is supported by that

of Crawford who stated that H.L. was "freaking out" and "implied that there was a sexual assault." Similarly, we reject defendant's contention that H.L. had "motive" to fabricate her statements as a way to "protect her boyfriend" and explain why defendant was beaten that morning. This is not supported by the record.

¶ 52    Defendant also argues that the statements were needlessly cumulative, thus, prejudicial. Relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). In this case, the statements H.L. made in the hospital were properly admitted to demonstrate consistency in her description of what occurred on the morning in question and to provide a full account of what occurred according to each witness who testified. We cannot conclude that the trial court's decision to admit these two statements was arbitrary, fanciful, or unreasonable under the circumstances.

¶ 53    Based on the foregoing, we conclude that the trial court did not abuse its discretion in admitting as excited utterances the two statements made by H.L.

¶ 54                                    B. Sentencing

¶ 55    Defendant argues that his 11-year sentence was excessive and should be reduced. In support, he argues that the trial court failed to consider his rehabilitation as an objective of sentencing, improperly considered factors inherent in the offense, and punished him for maintaining his innocence.

¶ 56    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence within the statutory limits for the offense

will not be disturbed unless the trial court has abused its discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *People v. Alexander,* 239 Ill. 2d 205, 212 (2010) (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). Such great deference is given to the trial court regarding sentencing decisions because a trial judge has observed the defendant and the proceedings and had a better opportunity to weigh factors and consider the defendant's demeanor and credibility. *Alexander,* 239 Ill. 2d at 213. However, determining whether a judge relied upon an improper factor in sentencing presents a question of law which is reviewed *de novo*. *People v. Abdelhadi,* 2012 IL App (2d) 111053, ¶ 8.

¶ 57    Defendant contends that "at no time during the court's discussion of the relevant sentencing factors did the court even mention rehabilitation." He argues, therefore, that the court ignored his "strong rehabilitative potential – such as his lack of significant criminal history, no prior sex offenses, and the fact that he had lived for 51 years as a productive member of society." "The rehabilitative potential of a defendant is only one of the factors that needs to be weighed in deciding a sentence, and the trial court does not need to expressly outline its reasoning for sentencing or explicitly find that the defendant lacks rehabilitative potential." *People v. Flores,* 404 Ill. App. 3d 155, 159 (2010). A review of the record reveals that although the trial judge never used the term "rehabilitation" during sentencing, he did in fact, consider evidence regarding rehabilitative potential when he noted defendant's brother testified that he was a "nice person" and a "good dad"; that defendant's prior criminal history was "entitled to be weighed in some way" but did not give it "a ton of weight" because of the nature of those prior offenses; and that defendant has a high school diploma, a supportive family, and had been "generally employed throughout his life."

Therefore, we reject defendant's assertion that the court did not consider these matters in determining defendant's sentence. Defendant continues that the court must, but failed to in this case, act upon those factors as an objective in imposing the sentence. See *People v. Bigham*, 226 Ill. App. 3d 1041, 1048-049 (1992). However, the court is not required to give rehabilitative potential more weight than the seriousness of the offense. *Bigham,* 226 Ill. App. 3d at 1049. Our review of the record reveals nothing to suggest that the court did not adequately balance the relevant factors in this case.

¶ 58    Defendant argues further that the primary factor the court relied on to justify his sentence was the serious nature of sexual assault crimes, which is a factor inherent in the offense. Defendant acknowledges that a trial court may consider whether a defendant's conduct caused or threatened serious harm as an aggravating factor (730 ILCS 5/5-5-3.2(a)(1) (West 2018)). However, he contends that the court may not consider the harm resulting from a defendant's conduct as an aggravating factor if harm is inherent in the offense. He contends further that because the court considered "nothing more than the generalized harm inherent in *every* sexual assault case" rather than a specific harm inflicted in this case, his sentence should be reduced. We reject defendant's argument.

¶ 59    "Generally, a trial court may not consider as an aggravating factor in sentencing a fact that is inherent in the offense with which the defendant was charged." *People v. Sanders,* 2016 IL App (3d) 130511, ¶ 13. Such "double enhancement"—using a single factor both as an element of the offense and as a basis for imposing a harsher sentence— is improper. *Abdelhadi,* 2012 IL App (2d) 111053, ¶ 9 (citing *People v. Gonzalez,* 151 Ill. 2d 79, 83-84 (1992)). However, it is appropriate for the court to consider the degree and gravity of the harm, emotional or physical, caused by the defendant's conduct even in cases where harm is implicit in the offense. *People v.*

*Jeffers,* 2022 IL App (2d) 210236, ¶ 26; *People v. Schultz*, 201 Ill. App. 3d 154, 162 (1990). Furthermore, there is a strong presumption that the trial court based its sentencing decision on proper legal reasoning, and a reviewing court should consider the record as a whole, rather than focusing on a few words or statements by the trial court. *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22.

¶ 60     In the case before us, the trial judge acknowledged that harm is inherent in the offense, stating, "I don't think an additional point gets added for defendant's [*sic*] caused or threatened serious harm in this case." When referring to the victim impact statements made by H.L. and her family members, the court acknowledged:

> "Any time that a person is raped and any time that a person suffers penetration by a person against their will, I think that abjectly qualifies as being serious physical harm. But again in the case of rape, it's also, I think, inherent in the offense itself. It is also while [*sic*] the legislature has determined [it] to be an 85 percent truth in sentencing offense when it comes to sentencing."

When referring to rape as "an ultimate violation of a person's bodily integrity," the court went on to state "[a]nd again I think that that reflects in the sentencing ranges that are available to the Court in this case."

¶ 61     However, in determining defendant's sentence, it was appropriate for the court to consider the gravity of the harm caused by defendant's conduct in this particular case. The court did so when discussing the need for deterrence:

> "That [the need for deterrence] has force in every case but particularly in this case, particularly in a case of rape, sexual assault against an unwilling, unwitting at the time woman in a home, in a place with her boyfriend where she had every expectation to be

safe, every expectation to be left alone when she went to bed that night. Every expectation

of waking up the next morning pursuing her daily life."

Similarly, when ruling on the motion to reconsider, the court discussed the impact of the harm caused by defendant's conduct when it referred to the victim impact statements. Based on the forgoing, we reject defendant's contention that the trial court improperly relied on the harm inherent in the offense in this case as a double enhancement.

¶ 62    Finally, defendant argues that the trial court based his sentence on a desire to punish him for maintaining his innocence. He points to the trial judge's description of defendant's statement in allocution that defendant was "minimizing or at least outright denying conduct and not just doing that, but making up a fantasy story as to what happened or what probably happened that evening in order to justify the conduct that he is now convicted of before this Court."

¶ 63    A trial judge may not "impose a more severe sentence simply 'because a defendant refuses to abandon his claim of innocence.' " *People v. Donlow,* 2020 IL App (4th) 170374, ¶ 84 (quoting *People v. Byrd,* 139 Ill. App. 3d 859, 866 (1986)).   The trial court may, however, consider a defendant's lack of remorse or lack of veracity in imposing a sentence, since those are factors which may have "a bearing on the defendant's potential for rehabilitation." *People v. Speed,* 129 Ill. App. 3d 348, 349 (1984). "In determining whether the trial court took defendant's failure to admit his guilt following conviction into account in its decision, reviewing courts have focused upon whether the trial court expressly indicated or implied that a defendant would have received better treatment in sentencing if he had abandoned his claim of innocence." *Donlow*, 2020 IL App (4th) 170374, ¶ 84 (citing *People v. Costello,* 95 Ill. App. 3d 680, 688 (1981)). If the record shows that the trial judge did nothing more than address the factor of remorsefulness as it pertained to defendant's rehabilitation, then the judge's reference to a defendant's claim of innocence will not

constitute reversible error. *Donlow*, 2020 IL App (4th) 170374, ¶ 84. As previously stated, a trial court's statements during sentencing are not read in isolation from one another, but rather in light of the entire record on appeal. See *Jeffers,* 2022 IL App (2d) 210236, ¶ 24.

¶ 64     During his statement in allocution, defendant maintained his innocence. He further stated that H.L.'s allegations were designed to cover up another crime, namely, that three men beat him and robbed him of $170. He suggested that H.L. made up the story about being sexually assaulted to justify the actions of those men and so they would avoid getting in trouble for attacking him. When referring to a potential factor in mitigation, whether the defendant's character and attitudes indicate that he is unlikely to commit another crime (730 ILCS 5/5-5-3.1(a)(9) (West 2018)), the court referred to defendant's statement in allocution:

> "I have no issue with any defendant, at any time, post jury trial taking the position that either I'm professing my own innocence or I didn't do it or taking the position that I'm being, as [defendant's] statement in allocation [*sic*] in some way framed. I will simply say that there is no evidence before this Court in any way, shape or form, any scintilla of evidence suggesting that [defendant] was framed or somehow set up."

¶ 65     The trial judge expressly stated he had "no issue" with defendant asserting his innocence, but the judge did express concern regarding defendant's lack of veracity and willingness to "mak[e] up a fantasy story as to what happened" instead. By suggesting that he was the victim, the trial judge assessed that defendant was not just maintaining his innocence, but he was minimizing the situation. The trial judge found that defendant's statement "[made] almost no sense whatsoever," commenting that for it to be true, multiple witnesses would have had to conspire and to come up with a detailed account of the assault and the events that ensued. The court rejected this idea as implausible and untrue. There is nothing in the record to suggest that

the trial court expressly indicated or implied that defendant would have received a lesser sentence if he had abandoned his claim of innocence. Rather, defendant's statement in allocution was discussed in the context of assessing his veracity as it related to his character and attitudes and likelihood of committing another crime. This was not improper.

¶ 66 After observing defendant and hearing the evidence firsthand, the trial court sentenced defendant to 11 years in prison for the criminal sexual assault of H.L. We determine that the court properly considered all relevant evidence in mitigation and aggravation and sentenced defendant within the statutory guidelines. On review, we may not reweigh the evidence and substitute our judgment for that of the trial court. *People v. Sven,* 365 Ill. App. 3d 226, 241 (2006). Because we cannot conclude that the trial court abused its discretion in sentencing defendant, we affirm the sentence.

¶ 67                                III. CONCLUSION

¶ 68 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 69 Affirmed.