NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220982-U

NO. 4-22-0982

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 20, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| JATTERIUS L. YANKAWAY, | ) | No. 20CF212 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) Counsel was not ineffective for filing a speedy trial demand under the wrong statute because defendant could not show counsel's deficient performance caused prejudice.

(2) Defendant's convictions for attempted first degree murder and aggravated battery violated the one-act, one-crime rule because the State treated the shooting as a single act by not apportioning the offenses among the shots fired in the charging documents or at trial.

(3) The trial court's misapprehension of the minimum sentence for attempted first degree murder did not arguably influence its sentencing decision.

(4) The trial court did not demonstrate judicial bias during sentencing.

¶ 2    In April 2020, defendant, Jatterius L. Yankaway, was charged with attempted first

degree murder (720 ILCS 5/8-4(a), 9-1(A)(1) (West 2018)), aggravated battery (720 ILCS

5/12-3.05(e)(1) (West 2018)), and unlawful possession of a weapon by a felon (UPWF) (720

ILCS 5/24-1.1(a) (West 2018)). After a trial, which began on September 19, 2022, the jury found defendant guilty of the charged offenses and found the State proved a 15-year sentencing enhancement for possessing a firearm while committing attempted first degree murder.

¶ 3    Defendant appeals, arguing (1) he received ineffective assistance when counsel filed a speedy trial demand under the wrong statute after agreeing to multiple continuances, (2) his convictions for attempted first degree murder and aggravated battery violated the one-act, one-crime rule, (3) the trial court misapprehended the applicable sentence for attempted first degree murder, and (4) the court showed judicial bias during sentencing.

¶ 4                I. BACKGROUND

¶ 5    On March 20, 2020, the Illinois Supreme Court entered an emergency order permitting circuit courts to continue trials indefinitely to prevent the spread of the novel COVID-19 virus. Ill. S. Ct., M.R. 30370 (eff. Mar. 20, 2020). The stay remained in effect until October 1, 2021. Ill. S. Ct., M.R. 30370 (eff. June 30, 2021).

¶ 6    On April 9, 2020, the State charged defendant with attempted first degree murder, aggravated battery, and UPWF. Count I alleged defendant "personally discharged a firearm at Robert Hunter *** with the intent to kill or do great bodily harm to *** Hunter," causing great bodily harm. Count II alleged defendant knowingly discharged a firearm in Hunter's direction without legal justification while committing a battery, "thereby causing an injury to *** Hunter by means of the discharging of said firearm." Count III alleged defendant "knowingly had in his possession a firearm" after being previously convicted of a felony.

¶ 7    On April 13, 2020, the State charged defendant with UPWF in Peoria County case No. 20-CF-238. The State elected to proceed on case No. 20-CF-238, and defendant pleaded

guilty on September 28, 2020. The trial court sentenced him to seven years' imprisonment. Defendant remained in custody during the subsequent proceedings.

¶ 8                                    A. Pretrial Continuances

¶ 9          Turning to the case at issue, the trial court initially set the trial for January 25, 2021. However, on January 14, 2021, the State asked for a continuance due to an unavailable witness. The court moved the trial date to April 26, 2021, over defense counsel's objection. On April 8, 2021, the State requested a continuance because "there is some ballistics work that still needs to be done on the items of evidence that were collected." Defense counsel did not object, and the trial was moved to August 30, 2021.

¶ 10          On August 19, 2021, the State asked for a continuance because a COVID-19-related lockdown at an Illinois Department of Corrections (DOC) facility rendered one of its witnesses unavailable. Defense counsel objected, asserting, "My client was planning to go to trial." The court moved the trial date to November 15, 2021.

¶ 11          On November 15, 2021, the trial court had three trials scheduled, and defense counsel was the attorney of record in each of them. The court doubted all three would be completed that day, and it suggested continuing defendant's trial. After conferring with the parties, the court scheduled the trial for February 28, 2022.

¶ 12          On February 24, 2022, one of the State's witnesses was unavailable due to another COVID-19-related DOC facility lockdown, and the trial court moved the trial date to July 11, 2022. The court entered an order showing the parties moved for a continuance. Defense counsel filed an objection, arguing he "did not approve" of the continuance and it "did not toll the Defendant's speedy trial rights."

¶ 13    On June 29, 2022, the State moved for another continuance because two witnesses were unavailable. Defense counsel objected to the continuance. The trial court tried to determine whether the case's speedy trial clock was running, and if so, when it would expire. After conferring with the parties, the court concluded the clock was running, but neither the court nor the parties could determine its expiration date. The court set the trial for September 19, 2022, but it scheduled a status hearing on August 10, 2022, to review the speedy trial issue.

¶ 14    On June 30, 2022, defense counsel filed a speedy trial demand under section 103-5 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/103-5 (West 2020)).

¶ 15    At the status hearing on August 10, 2022, the trial court stated, "I don't think there is a speedy trial issue because [defendant] can't get out anyway," and it left the September trial date unchanged.

¶ 16                    B. Motion to Dismiss

¶ 17    On September 15, 2022, defense counsel filed a motion to dismiss, alleging a speedy trial violation occurred. The motion argued the speedy trial clock began to run on October 1, 2021, and the continuances granted on August 19, 2021, February 24, 2022, and June 30, 2022, were not attributable to defendant. It alleged that, of the time between October 1, 2021, and the trial date of September 19, 2022, 228 days were not attributable to defendant and those 228 days exceeded the 120-day limit under section 103-5 of the Criminal Code. The trial court denied the motion, finding a 160-day speedy trial period applied pursuant to section 3-8-10 of the Unified Code of Corrections (Intrastate Detainers Statute) (730 ILCS 5/3-8-10 (West 2020)), and the trial fell within that time frame.

¶ 18           C. Attempted First Degree Murder Sentencing Range

¶ 19        On September 19, 2022, prior to trial, the State advised the trial court the sentencing range for attempted first degree murder was 6 to 30 years' imprisonment, with an additional 15 or 20 years possible, depending on which enhancement the State chose to pursue. The State asserted, "I believe that upon conviction the People would only be asking for a 15-year possession of a firearm [enhancement]," and "I can represent now that upon conviction I would be adding 15 years." Based on the 15-year enhancement, defendant faced a sentencing range of 21 to 45 years for attempted first degree murder, and the court admonished defendant accordingly.

¶ 20                                   D. Jury Trial

¶ 21        At trial, the evidence showed defendant and his accomplice, Jafari Robinson, shot Robert Hunter, defendant's cousin, multiple times during the early hours of July 26, 2019. Hunter testified he attended a party that night and he left the party in a vehicle with defendant, Robinson, and two other individuals. When Hunter exited the vehicle, he turned around and saw defendant and Robinson standing on either side of the vehicle, holding firearms. Hunter saw "flashes" and heard gunshots. Hunter suffered gunshot wounds to his "lower abdomen, left lower thigh, left groin, left thumb, left pinky and middle finger, left forearm, and left biceps." Due to his injuries, Hunter lost one of his fingers, he can no longer have children, and he cannot walk and must use a wheelchair.

¶ 22        Officers discovered five rounds of spent .40-caliber cartridge cases at the scene of the shooting. After defendant's arrest, officers found a .40-caliber handgun in the vehicle defendant was driving. Testing showed "very strong support" that defendant contributed DNA to the handgun's grip and trigger. Dustin Johnson, a forensic scientist who testified as an expert in

the field of firearm identification, said two of the spent .40-caliber rounds discovered at the scene were fired from defendant's .40-caliber handgun.

¶ 23        At the trial's conclusion, the jury found defendant guilty of attempted first degree murder, aggravated battery, and UPWF. The jury also found the State proved the 15-year enhancement for possessing a firearm while committing attempted first degree murder.

¶ 24        Defendant filed a motion for a new trial, arguing the trial court erred in denying his motion to dismiss on speedy trial grounds. The court denied the motion.

¶ 25                                 E. Sentencing Hearing

¶ 26        On October 26, 2022, the matter proceeded to sentencing. During defendant's statement in allocution, the following exchange occurred:

> "THE COURT: [Y]ou have the opportunity to say something in your own behalf, if you'd like to, before you get a sentence. I'm not suggesting you should or should not say anything, but if there's anything you would like to[ ] say now would be the time.
>
> Anything you'd like to say?
>
> [DEFENDANT]: Yeah, Your Honor.
>
> I want to take the time to let my little brother know that he'll see what I'm going through right now and just be mindful of who you keep around you and what you do out there. Even if you is innocent, there's still people ain't going to look at it the same with you having a reputation.
>
> I know I ain't a bad person. I know you all said a lot in this court. I know I ain't no bad person. I know I did a lot of good out there. I changed a lot of people life [*sic*], and I'm going to continue to do that. I'm going to continue to strive.

Yeah, my best friend [(the victim)] came in here and he told him—he told a lie. And if you all feel like that's the truth, that's on you all. It's deeper than the trial.

THE COURT: No. It's not on us all. It's on you.

[DEFENDANT]: It's deeper than the trial to me. This was—this is losing a family member and losing more family. I mean, it might be entertaining to you all, but—

THE COURT: I don't find it the least bit entertaining.

Go ahead.

[DEFENDANT]: It was different. So I want to see—I want you all to see—to my little brother, I want you to see how many people love me knowing that I was innocent. Just for they own pride, for they own thing, and I want—I want you to just really focus and pay attention. I want you all to pay attention. Look how many people ain't in this courtroom right now. How many people's life I changed. Focus on that. No matter how good you do, there's going to be an outcome like this if you play around with the wrong people. And to that I would—forever I would be my brother['s] keeper.

That's all I got to say.

THE COURT: All right. Thank you."

¶ 27    Before delivering its sentencing decision, the trial court made the following comments:

"[Y]ou murdered your cousin.

So to say that somebody has a bad view of you comes as a surprise to no one. When you murder your cousin and your best friend or try to, that has a way of sticking around.

***

[Y]ou said during your release that you were trying to spend time with your son and, quote, just trying to stay alive.

When the probation officer asked for you to expand on that, you know, what's that all about, he said in 2015, when you were sentenced to the DOC, you kept hearing about friends of yours being killed and locked up for serious offenses. And you went on to say that this made you start feeling somewhat depressed and have anxiety about your own safety when back in the community.

You, [defendant], are the person that the community needs to be afraid of, but, worse than that, your own family, your own family, and your own friend needed to be afraid of you.

Now, maybe, maybe your view or maybe the way you cope with this is to say that he was going to kill me first. I don't see any evidence of that, but, either way, as difficult as this if for me to say, you are the reason prisons are built."

The court concluded, "I can't think of another case off the top of my head where the Defendant has been so cavalier, not in a rude way, I think you've not been rude, here you've been cordial, for the most part, but it's a shame that you picked a life of prison and not a life of Peoria."

¶ 28   The trial court sentenced defendant to 70 years' imprisonment—44 years for attempted first degree murder and 26 years for aggravated battery, to be served consecutively. It

did not sentence defendant for UPWF, saying, "A finding will be entered on the [UPWF] in Count 3, but judgment will not be entered." In delivering its sentencing decision, the court stated:

> "[I]t's the order and judgment of the Court that the Defendant *** be sentenced in Count 1, attempt first-degree murder, a Class X felony, to a term in [DOC] of 44 years. That it be followed by a period of three years of mandatory supervised release known as parole. That it be served at its 85 percent rate.
>
> It will be mandatorily consecutive to Count 2 as a matter of law. 44 years being a 26-year minimum because it's a 20-year tack-on with a six-year minimum. 44 years in total. It should be served at the mandatory consecutive rate in Count 2. Judgment is entered on Count 1.
>
> On Count 2, for aggravated battery, for 26 years, and that that be served with three years of mandatory supervised release as well."

¶ 29　On November 7, 2022, defendant filed a motion to reconsider his sentence, which the trial court denied.

¶ 30　This appeal followed.

¶ 31　　　　　　　　　　　　　II. ANALYSIS

¶ 32　Defendant argues (1) he received ineffective assistance when defense counsel did not file a speedy trial demand until June 30, 2022, and he failed to file the demand under the Intrastate Detainers Statute; (2) his convictions for attempted first degree murder and aggravated battery violated the one-act, one-crime rule; (3) the trial court misapprehended the minimum sentence defendant faced for attempted first degree murder; and (4) the court denied defendant a fair sentencing hearing by demonstrating judicial bias. We disagree.

- 9 -

¶ 33        A. Defendant Cannot Show Defense Counsel's Deficient Performance Caused

Prejudice

¶ 34        While defendant possesses both a statutory and constitutional speedy trial right, this appeal involves only his statutory right. See 725 ILCS 5/103-5(a) (West 2022); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, § 8. When an incarcerated individual faces more than one charge in the same county, they "shall be tried upon all of the remaining charges thus pending within 160 days." 725 ILCS 5/103-5(e) (West 2022). The 160-day speedy trial timeline also applies "to persons committed to any institution or facility or program in the [DOC] who have untried complaints, charges[,] or indictments pending." 730 ILCS 5/3-8-10 (West 2022). Such a person must file an unambiguous speedy trial demand meeting the Intrastate Detainers Statute's requirements. See *People v. Staten*, 159 Ill. 2d 419, 428, 639 N.E.2d 550, 555 (1994); *People v. Sandoval*, 236 Ill. 2d 57, 65-67, 923 N.E.2d 292, 297-98 (2010). "[A] mere objection to delay does not suffice to invoke the statutory speedy-trial right. Rather, the defendant must make an objection specifically by demanding trial." *People v. Hartfield*, 2022 IL 126729, ¶ 35, 202 N.E.3d 890.

¶ 35        Defendant argues defense counsel provided ineffective assistance when he did not file a speedy trial demand under the Intrastate Detainers Statute or object on speedy trial grounds when the trial court granted continuances on August 19, 2021, November 15, 2021, February 24, 2022, and June 30, 2022. Defendant insists that had counsel filed a timely speedy trial demand under the proper statute and objected to the State's continuance requests, the 228 days allegedly not attributable to defendant between October 1, 2021, when our supreme court lifted the emergency order, and trial date on September 19, 2022, would have constituted a statutory speedy trial violation.

- 10 -

¶ 36 Defendant was subject to the Intrastate Detainers Statute because he was incarcerated when the State proceeded on the charges in the case below. See 730 ILCS 5/3-8-10 (West 2022). Defense counsel did not file a speedy trial demand until June 30, 2022, and he filed it under section 103-5 of the Criminal Code rather than the Intrastate Detainers Statute. Because counsel did not file the demand under the proper statute, the 160-day limit did not begin to run. See *Staten*, 159 Ill. 2d at 428-30.

¶ 37 When faced with an ineffective assistance of counsel claim, we apply the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 10, 93 N.E.3d 664. "To prevail on such a claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." (Internal quotation marks omitted.) *Thomas*, 2017 IL App (4th) 150815, ¶ 10. To establish deficient performance, the defendant must demonstrate counsel's performance "fell below an objective standard of reasonableness." *Thomas*, 2017 IL App (4th) 150815, ¶ 10. To establish prejudice, the defendant must show that, "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." (Internal quotation marks omitted.) *Thomas*, 2017 IL App (4th) 150815, ¶ 11. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 38 We find instructive our decisions in *People v. Jackson*, 235 Ill. App. 3d 732, 601 N.E.2d 1317 (1992), and *People v. Willis*, 235 Ill. App. 3d 1060, 601 N.E.2d 1307 (1992). *Jackson* and *Willis* involved codefendants represented by the same defense counsel, both of whom argued counsel was ineffective for filing a speedy trial demand under section 103-5 of the

Criminal Code rather than the Intrastate Detainers Statute. See *Jackson*, 235 Ill. App. 3d at 736; *Willis*, 235 Ill. App. 3d at 1063. Both defendants were incarcerated for 210 days between counsel's speedy trial demand and the trial's start date. *Jackson*, 235 Ill. App. 3d at 736, 739; *Willis*, 235 Ill. App. 3d at 1068. Both insisted counsel's allegedly deficient performance prejudiced them because the 160-day speedy trial limit would have expired if counsel had filed a demand under the proper statute. *Jackson*, 235 Ill. App. 3d at 736-40; *Willis*, 235 Ill. App. 3d at 1065-69.

¶ 39        In both *Jackson* and *Willis*, we found counsel's performance deficient. While counsel insisted he did not know the defendants were incarcerated when he filed his speedy trial motion, the record available to him showed they were. *Jackson*, 235 Ill. App. 3d at 737; *Willis*, 235 Ill. App. 3d at 1066. We determined "counsel should have known [the Intrastate Detainers Statute] governed [the defendants'] right to a speedy trial," and therefore counsel's actions "fell below a reasonably competent standard." *Jackson*, 235 Ill. App. 3d at 738; see *Willis*, 235 Ill. App. 3d at 1067.

¶ 40        However, we found the defendants failed to demonstrate prejudice because "the record [did] not support the conclusion that if defense counsel had filed the appropriate speedy-trial demand the State would not have brought defendant to trial within 160 days." *Jackson*, 235 Ill. App. 3d at 740; see *Willis*, 235 Ill. App. 3d at 1069. We emphasized that a prejudice finding would be wholly speculative, finding, "We cannot presume the State would not have prosecuted defendant within the required time. We simply do not know what would have happened had defense counsel filed a proper intrastate detainers motion." *Willis*, 235 Ill. App. 3d at 1069; see *Jackson*, 235 Ill. App. 3d at 740.

¶ 41            A notable factual difference exists between those cases and the one at issue. In *Jackson*, we observed, "The State's brief indicates defendant's trial was not delayed because of case backlog." *Jackson*, 235 Ill. App. 3d at 740. We found the State chose not to try the defendants within 160 days "because [the State] knew defense counsel erroneously cited section 103-5 of the Code, rather than [the Intrastate Detainers Statute], and did not fulfill the terms of the latter section in requesting a speedy trial." *Jackson*, 235 Ill. App. 3d at 740. We denounced the State's decision as "an inappropriate reliance on the procedural requirements of [the Intrastate Detainers Statute], particularly when the information that would have been contained in a proper demand was already known to the prosecutor." *Jackson*, 235 Ill. App. 3d at 740. Here, neither the record nor the briefs suggest the State inappropriately exploited defense counsel's mistaken belief regarding the applicable speedy trial time frame. Instead, the record suggests the State, defense counsel, and the trial court all operated under similar misunderstandings regarding the speedy trial time frame during the hearing on June 30, 2022.

¶ 42            Nevertheless, we reach the same conclusion here as we did in *Jackson* and *Willis*. Defendant was incarcerated for the duration of the proceedings below. Defense counsel's performance fell below a reasonably competent standard because he should have known the Intrastate Detainers Statute governed defendant's speedy trial right. See *Jackson*, 235 Ill. App. 3d at 738; *Willis*, 235 Ill. App. 3d at 1067. However, the record does not support the conclusion that if defense counsel filed a speedy trial demand under the proper statute, defendant would not have been brought to trial within 160 days. See *Jackson*, 235 Ill. App. 3d at 740; *Willis*, 235 Ill. App. 3d at 1069. We simply do not know what would have happened if defense counsel filed a proper intrastate detainers motion earlier in the process. *Jackson*, 235 Ill. App. 3d at 740; *Willis*, 235 Ill. App. 3d at 1069. Therefore, defendant cannot satisfy *Strickland*'s second prong by

showing a reasonable probability exists the proceeding's result would have been different but for counsel's error in preparing defendant's speedy trial demand. *Jackson*, 235 Ill. App. 3d at 740; *Willis*, 235 Ill. App. 3d at 1069. Accordingly, defendant's ineffective assistance argument fails. See *Simpson*, 2015 IL 116512, ¶ 35.

¶ 43　　　　　B. Defendant's Convictions for Attempted First Degree Murder and Aggravated x

Battery Violated the One-Act, One-Crime Rule

¶ 44　　　　　Next, defendant argues we must vacate his aggravated battery conviction for violating the one-act, one crime rule. While defendant forfeited this issue by not raising it during the proceedings below or including it in a posttrial motion, he contends it constitutes second-prong plain error.

¶ 45　　　　　The plain error doctrine permits us to review unpreserved error in two instances: "(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48, 23 N.E.3d 325.

"Under the second prong of plain-error review, prejudice to the defendant is presumed because of the importance of the right involved, *regardless* of the strength of the evidence." (Emphasis in original and internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010). "[O]ne-act, one crime violations fall within the second prong of the

plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process." *People v. Coats*, 2018 IL 121926, ¶ 10, 104 N.E.3d 1102.

¶ 46 "[A] criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *Coats*, 2018 IL 121926, ¶ 11. When conducting a one-act, one-crime analysis, we first "ascertain[ ] whether the defendant's conduct consists of a single physical act or separate acts." *Coats*, 2018 IL 121926, ¶ 12. An act is "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977). If the defendant committed multiple acts, we must then "determine[ ] whether any of the offenses are lesser-included offenses. [Citation.] If none of the offenses are lesser-included offenses, then multiple convictions are proper." *Coats*, 2018 IL 121926, ¶ 12. We review *de novo* whether a one-act, one-crime violation occurred. *Coats*, 2018 IL 121926, ¶ 12.

¶ 47 1. *The State Did Not Apportion the Offenses Among the Different Gunshots*

¶ 48 Defendant argues his attempted first degree murder and aggravated battery convictions were based on the same act, and he claims the State did not apportion the offenses into separate conduct. Relying on *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001), defendant contends we should not distinguish between the various gunshots because the State did not make that distinction in the charging documents or at trial.

¶ 49 In *Crespo*, the defendant stabbed the victim three times, but the State did not differentiate between the different stab wounds when charging the defendant with armed violence and two counts of aggravated battery. *Crespo*, 203 Ill. 2d at 342-43. Rather than apportioning the offenses among the three stab wounds, the indictment treated the stabbings as a single infliction of bodily harm and "charge[d] [the] defendant with the same conduct under

- 15 -

different theories of criminal culpability." *Crespo*, 203 Ill. 2d at 342. After reviewing the indictment and the State's closing argument to the jury, our supreme court determined "the State's theory at trial *** amply supports the conclusion that the intent of the prosecution was to portray [the] defendant's conduct as a single attack." *Crespo*, 203 Ill. 2d at 343-44. The court found the defendant's convictions for armed violence and aggravated battery with a deadly weapon violated the one-act, one-crime doctrine, and it vacated his conviction for aggravated battery with a deadly weapon. *Crespo*, 203 Ill. 2d at 344-46.

¶ 50    In *People v. Beltran*, 327 Ill. App. 3d 685, 693, 765 N.E.2d 1071, 1078 (2002), the Second District applied *Crespo* to an incident involving multiple shooters, after which the defendant was convicted of attempted first degree murder and aggravated discharge of a firearm. The Second District summarized *Crespo*'s finding thusly: "[A]lthough the multiple stabbings could have supported the separate convictions, the State did not apportion the crimes among the various wounds, either in the indictment or at trial. Because the State portrayed the defendant's conduct as a single attack, multiple convictions were untenable." *Beltran*, 327 Ill. App. 3d at 693. The Second District found *Crespo* controlled because, while the defendant and his accomplice fired multiple shots at multiple victims, the State "did not specify which shot supported which charge" in the indictment or at trial. *Beltran*, 327 Ill. App. 3d at 693. The Second District concluded, "Thus, against each victim, defendant committed a single act that supported only a single conviction," and it vacated the defendant's aggravated discharge of a firearm convictions. *Beltran*, 327 Ill. App. 3d at 693.

¶ 51    We find *Crespo* controls. While defendant and his accomplice fired multiple gunshots, which would have supported the different charges if distinguished in the charging documents or at trial (see *Crespo*, 203 Ill. 2d at 342, 345; *Beltran*, 327 Ill. App. 3d at 693), the

- 16 -

State failed to apportion the offenses to the various gunshots fired, "and it is improper for this court to do so now on appeal." *Crespo*, 203 Ill. 2d at 345. On appeal, the State argues the shooting consisted of multiple acts because the jury was instructed on defendant's accountability for his accomplice's actions. However, the State fails to distinguish *Crespo* and *Beltran*, which require us to look to the proceedings below to identify how the State treated the conduct at issue. See *Crespo*, 203 Ill. 2d at 345 ("[T]he indictment must indicate that the State intended to treat the conduct of defendant as multiple acts in order for multiple convictions to be sustained."); *Beltran*, 327 Ill. App. 3d at 693 ("Because the State portrayed the defendant's conduct as a single attack, multiple convictions were untenable."). *Beltran* also dealt with a shooting involving a defendant and an accomplice, finding the defendant's accountability for his accomplice's actions did not prevent his convictions from violating the one-act, one-crime rule. See *Beltran*, 327 Ill. App. 3d at 692-93. We agree with *Beltran* and reach the same conclusion.

¶ 52        During the proceedings below, the State treated the shooting as a single act of bodily harm, as it did not apportion the charged offenses to the gunshots fired or the multiple injuries inflicted. See *Beltran*, 327 Ill. App. 3d at 693. Accordingly, defendant's conduct constituted a single act, which cannot sustain multiple convictions. See *Coats*, 2018 IL 121926, ¶ 11. We vacate defendant's conviction and sentence for aggravated battery, as attempted first degree murder is the more serious offense. See *Beltran*, 327 Ill. App. 3d at 693.

¶ 53                2. *Sentencing on Defendant's UPWF Conviction*

¶ 54        The State contends we should remand this matter for defendant to be sentenced on his UPWF conviction if we find a one-act, one-crime violation occurred. Defendant does not challenge this contention. The jury found defendant guilty of UPWF, but the trial court did not impose a sentence for it. The final judgment in a criminal case is the imposition of a sentence,

and the sentence is a necessary part of a complete judgment of guilt. *People v. Robinson*, 267 Ill. App. 3d 900, 907, 642 N.E.2d 1317, 1322 (1994). "In the absence of a sentence, a judgment of conviction is not final." *Robinson*, 267 Ill. App. 3d at 907. "The proper remedy for a failure to enter judgment is to remand to the circuit court for entry of judgment." *Robinson*, 267 Ill. App. 3d at 907. Because the court did not sentence defendant for his UPWF conviction, remand for sentencing on that count is necessary. See *People v. Segara*, 126 Ill. 2d 70, 78, 533 N.E.2d 802, 806 (1988) (remanding the matter "for sentencing on the second conviction because sentencing is a necessary component of a judgment of conviction").

¶ 55  We quickly note remand for sentencing on defendant's UPWF conviction raises no one-act, one-crime concerns, as defendant performed multiple acts by possessing a handgun and then firing it at Hunter. See *King*, 66 Ill. 2d at 566. The State distinguished those actions in the charging documents, and neither attempted first degree murder nor UPWF is a lesser-included offense of the other. See 720 ILCS 5/8-4(a), 9-1(A)(1), 24-1.1(a) (West 2020); *Coats*, 2018 IL 121926, ¶ 12.

¶ 56  C. The Trial Court's Misapprehension of the Sentencing Range Did Not Arguably Influence Its Sentencing Decision

¶ 57  Defendant also argues the trial court misapprehended the minimum sentence for attempted first degree murder, and the alleged misapprehension influenced the court's sentencing decision. As with his one-act, one-crime claim, defendant acknowledges he did not properly preserve these arguments, but he asks us to review them for second-prong plain error.

¶ 58  To establish second-prong plain error in the sentencing context, "a defendant must first show that a clear or obvious error occurred. [Citation.] Then, the defendant must show that *** the error was so egregious as to deny the defendant a fair sentencing hearing." *People v.*

*Fisher*, 2023 IL App (4th) 220717, ¶ 29. "A misstatement of the understanding of the minimum sentence by the trial judge necessitates a new sentencing hearing only when it appears that the mistaken belief of the judge arguably influenced the sentencing decision." *People v. Eddington*, 77 Ill. 2d 41, 48, 394 N.E.2d 1185, 1188 (1979).

¶ 59    In *Eddington*, the trial court erroneously believed the minimum sentence applicable was 4 years' imprisonment, though it ultimately imposed a 20-year sentence. *Eddington*, 77 Ill. 2d at 48; see *People v. Eddington*, 64 Ill. App. 3d 650, 655, 381 N.E.2d 835, 839 (1978). In reaching its conclusion, our supreme court distinguished *People v. Moore*, 69 Ill. 2d 520, 372 N.E.2d 666 (1978), where "the trial judge imposed a 4-year minimum sentence term on a defendant, thinking that the law required a 4-year minimum term." *Eddington*, 77 Ill. 2d at 48 (citing *Moore*, 69 Ill. 2d at 521-24). The *Eddington* court found, "Nothing like that occurred here. The [trial] judge here expressly stated that 'this isn't the minimal kind of situation.' " *Eddington*, 77 Ill. 2d at 48. Our supreme court affirmed the defendant's sentence, finding, "Although the trial [judge] did refer, in his evaluation of the case for sentencing purposes, to his mistaken belief as to the minimum sentence required, there is no indication here that the 4-year minimum term was used by the trial judge as a reference point ***." *Eddington*, 77 Ill. 2d at 48.

¶ 60    *Eddington* applies here. The jury found the State met its burden regarding the 15-year sentencing enhancement for possessing a firearm while committing attempted first degree murder. Based on the 15-year enhancement, defendant faced a sentencing range of 21 to 45 years' imprisonment for attempted first degree murder. However, after imposing a 44-year sentence for attempted first degree murder, the trial court erroneously said defendant faced a 26-year minimum for that offense "because it's a 20-year tack-on with a six-year minimum." Notably, the court delivered its attempted first degree murder sentencing decision before

demonstrating its mistaken belief. It also expressed no intent to sentence defendant to the minimum or maximum sentence, nor did it seek to impose a sentence directly tied to either extreme. We find the court did not use its misapprehension of the applicable minimum sentence as a reference point, and its misstatement satisfied neither plain error prong. See *Eddington*, 77 Ill. 2d at 48.

¶ 61 Defendant analogizes this case to *People v. Hausman*, 287 Ill. App. 3d 1069, 679 N.E.2d 867 (1997). In *Hausman*, the trial court erroneously stated the applicable minimum sentence for aggravated battery was three years, rather than two years, and it imposed consecutive three-year prison terms. *Hausman*, 287 Ill. App. 3d at 1070-71. In doing so, the court declared, "[E]ven though I think your record mandates a much longer sentence, I am going to impose the *minimum sentence of three (3) years* in the [DOC]." (Emphasis added.) *Hausman*, 287 Ill. App. 3d at 1071. Based on the court's statements, we vacated the defendant's sentence and remanded for a new sentencing hearing because "it arguably influenced the judge's sentencing decision." *Hausman*, 287 Ill. App. 3d at 1072.

¶ 62 *Hausman* is distinguishable. There, the trial court's statements clearly and undeniably influenced its sentencing decision—the court sought to impose the minimum sentence, it believed the offense carried a three-year minimum sentence, and thus it sentenced the defendant to three years' imprisonment. See *Hausman*, 287 Ill. App. 3d at 1070-71. The same was true in *Moore*, where the trial court imposed a four-year sentence because it believed that was the minimum. *Moore*, 69 Ill. 2d at 521. Conversely, the trial court here declared the incorrect minimum sentence for attempted first degree murder, but it did not use that incorrect minimum as a reference point when sentencing defendant. See *Eddington*, 77 Ill. 2d at 48. The court's mistaken belief regarding the applicable minimum sentence for attempted first degree

murder did not arguably influence its sentencing decision. See *Eddington*, 77 Ill. 2d at 48. Accordingly, plain error did not occur.

¶ 63     D. The Trial Court Did Not Demonstrate Judicial Bias During Sentencing

¶ 64     Finally, defendant argues the trial court exhibited judicial bias against him, thereby denying him a fair sentencing hearing. "A sentencing hearing is fundamentally unfair when the proceeding is affected by judicial bias." *People v. Montgomery*, 2023 IL App (3d) 200389, ¶ 28. "Trial judges are presumed to be impartial, and the party claiming bias bears the burden of overcoming this presumption." *Montgomery*, 2023 IL App (3d) 200389, ¶ 28. To prevail on a judicial bias claim, a defendant must show the court exhibited "animosity, hostility, ill will, or distrust" toward the defendant. *People v. Vance*, 76 Ill. 2d 171, 181, 390 N.E.2d 867, 872 (1979). "Allegations of judicial bias must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." *People v. Jackson*, 205 Ill. 2d 247, 277, 793 N.E. 2d 1, 19 (2001). We review *de novo* whether a trial court's conduct constitutes bias and requires reversal. *Fisher*, 2023 IL App (4th) 220717, ¶ 31.

¶ 65     As evidence of the trial court's purported bias, defendant highlights comments made during sentencing. During defendant's statement in allocution, defendant accused Hunter of lying during his testimony, saying, "[M]y best friend came in here and *** he told a lie. And if you all feel like that's the truth, that's on you all. It's deeper than the trial." The court briefly interjected, responding, "No. It's not on us all. It's on you." When defendant countered, "I mean, it might be entertaining to you all," the court replied, "I don't find it the least bit entertaining." Before delivering defendant's sentence, the court laid out the factors it considered in reaching its decision. In doing so, the court commented, "[Defendant is] the person that the community

needed to be afraid of," "[defendant is] the reason prisons are built," and "I can't think of another case off the top of my head where the Defendant has been so cavalier."

¶ 66    When viewed in context, these statements do not demonstrate bias against defendant. During his statement in allocution, defendant refused to accept responsibility for his actions and portrayed himself as a victim. Defendant blamed the trial court for believing Hunter's testimony and suggested the court found the process "entertaining." The court quickly refuted both assertions without belaboring either point. The court told defendant the community needed to fear him in response to defendant's claim he experienced anxiety and feared for his own safety when in the community. After noting Hunter, defendant's cousin, needed to fear defendant, the court declared, "[M]aybe the way you cope with this is to say that [Hunter] was going to kill me first. I don't see any evidence of that, but, either way, as difficult as this is for me to say, you are the reason prisons are built."

¶ 67    "The seriousness of the crime is the most important factor in determining an appropriate sentence." (Internal quotation marks omitted.) *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 50. Additionally, "trial courts may consider a defendant's lack of remorse or lack of veracity in imposing a sentence, since those are factors which may have a bearing on the defendant's potential for rehabilitation." (Internal quotation marks omitted.) *People v. Donlow*, 2020 IL App (4th) 170374, ¶ 84, 178 N.E.3d 1148; see *People v. Ward*, 113 Ill. 2d 516, 528, 499 N.E.2d 422, 426 (1986) ("[A] continued protestation of innocence and a lack of remorse may convey a strong message to the trial judge that the defendant is an unmitigated liar and at continued war with society. Such impressions *** are proper factors to consider in imposing sentence."). Here, the trial court responded to the seriousness of defendant's crimes and the significance of his refusal to accept responsibility, which are proper considerations during

sentencing. See *Kendrick*, 2023 IL App (3d) 200127, ¶ 50; *Donlow*, 2020 IL App (4th) 170374, ¶ 84.

¶ 68      Likewise, the record shows the trial court described defendant as "cavalier" because defendant's record demonstrated a complete disregard for the law, as well as a preference for committing crimes rather than abiding by the rules of society. Specifically, the court said, "I can't think of another case off the top of my head where the Defendant has been so cavalier, not in a rude way, I think you've not been rude, here you've been cordial, for the most part, but it's a shame that you picked a life of prison and not a life of Peoria." The court's statements, in context, demonstrate it was responding to the offense's seriousness, defendant's commitment to a life of crime, and defendant's refusal to take responsibility for his actions. They do not show "animosity, hostility, ill will, or distrust" toward defendant. *Vance*, 76 Ill. 2d at 181. Accordingly, remand for a new sentencing hearing is not warranted.

¶ 69                          III. CONCLUSION

¶ 70      For the foregoing reasons, we affirm defendant's attempted first degree murder conviction and sentence, vacate his aggravated battery conviction and sentence, and remand this matter to the trial court for the limited purpose of sentencing defendant for his UPWF conviction.

¶ 71      Affirmed in part and vacated in part; cause remanded with instructions.